$\Lambda H \Lambda$

IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA ex rel. CHAD WAHL, | ) ) ) | |
| Petitioner, | ) ) | |
| v. | ) ) | No. 08 C 1383 |
| GREG SIMS, Warden, Taylorville Correctional Center, | ) ) ) | The Honorable |
| Respondent. | ) ) ) | Joan H. Lefkow, Judge Presiding. |

**FILED**

APR 3 0 2008  T C
4-30-2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## TO THE CLERK OF THE UNITED STATES DISTRICT COURT

Pursuant to Rule 5 of the Rules Governing Section 2254 Cases in the United States District Courts, the attached Exhibits to respondent's Motion to Dismiss the above-captioned Petition for Writ of Habeas Corpus are hereby filed with this Court:

Exhibit A:    *People v. Wahl*, 674 N.E.2d 454 (Ill.App. 1996);

Exhibit B:    Order, *People v. Wahl*, No. 82674 (Ill. 1997);

Exhibit C:    First Postconviction petition, *People v. Wahl*, No. 93 CF 1410, Circuit Court of Kane County;

Exhibit D:    Rule 23 Order, *People v. Wahl*, No. 2-99-1370 (Ill.App. 2001);

Exhibit E:    Order, *People v. Wahl*, No. 91490 (Ill. 2001);

Exhibit F:    Second postconviction petition, *People v. Wahl*, 93 CF 1410, Circuit Court of Kane County;

Exhibit G:    Rule 23 Order, *People v. Wahl*, No. 2-05-1215 (Ill.App. 2006); and

Exhibit H:    Order, *People v. Wahl*, No. 103760 (Ill. 2007).

April 30, 2008

Respectfully submitted,

LISA MADIGAN
Attorney General of Illinois

By: _____

ERIC W. TRUETT, Bar # 6291213
Assistant Attorney General
100 W. Randolph Street, 12th Floor
Chicago, Illinois 60601-3218
PHONE: (312) 814-4684
FAX: (312) 814-2253
E-MAIL: etruett@atg.state.il.us

Westlaw.

674 N.E.2d 454               Page 1
285 Ill.App.3d 288, 674 N.E.2d 454, 220 Ill.Dec. 911
**(Cite as: 285 Ill.App.3d 288, 674 N.E.2d 454)**

**H**

PEOPLE v. WAHL
Ill.App. 2 Dist.,1996.

Appellate Court of Illinois,Second District.
The PEOPLE of the State of Illinois, Plaintiff-Appellee,
v.
Chad WAHL, Defendant-Appellant.
**No. 2-94-0635.**

Dec. 12, 1996.
Rehearing Denied Jan. 14, 1997.

Defendant was convicted in the Circuit Court, Kane County, James T. Doyle, J., of six counts of aggravated criminal sexual abuse, one count of aggravated criminal sexual assault, and one count of attempted aggravated criminal sexual assault, and he received consecutive sentences of four years' imprisonment for each count of aggravated criminal sexual abuse, ten years' imprisonment for aggravated criminal sexual assault, and seven years' imprisonment for attempted aggravated criminal sexual assault. Defendant appealed. The Appellate Court, Hutchinson, J., held that closely related offenses exception to offense-specific Sixth Amendment right to counsel did not apply so as to preclude questioning of defendant regarding offenses against minors other than boys regarding whom defendant had already been charged.

Affirmed in part and vacated in part.

West Headnotes

**[1] Criminal Law 110 ⚖412.2(4)**

110 Criminal Law
  110XVII Evidence
    110XVII(M) Declarations
      110k411 Declarations by Accused
        110k412.2 Right to Counsel; Caution
          110k412.2(4) k. Absence or Denial
of Counsel. Most Cited Cases

Closely related offenses exception to offense-specific Sixth Amendment right to counsel did not apply so as to preclude questioning of defendant regarding offenses against minors other than boys regarding whom defendant had already been charged with aggravated criminal sexual abuse, despite similarity of offenses against all victims; pre- and post-questioning charges concerned different victims, offenses were committed over time span of approximately nine months, and instances of abuse or assault were neither continuous nor simultaneous. U.S.C.A. Const.Amend. 6.

**[2] Criminal Law 110 ⚖412.2(5)**

110 Criminal Law
  110XVII Evidence
    110XVII(M) Declarations
      110k411 Declarations by Accused
        110k412.2 Right to Counsel; Caution
          110k412.2(5) k. Failure to Request
Counsel; Waiver. Most Cited Cases
Defendant does not waive Sixth Amendment right to counsel when police officer reads *Miranda* warnings to defendant who then acquiesces to officer's questioning. U.S.C.A. Const.Amend. 6.

**[3] Criminal Law 110 ⚖412.2(4)**

110 Criminal Law
  110XVII Evidence
    110XVII(M) Declarations
      110k411 Declarations by Accused
        110k412.2 Right to Counsel; Caution
          110k412.2(4) k. Absence or Denial
of Counsel. Most Cited Cases
Sixth Amendment right to counsel, unlike Fifth Amendment privilege against self-incrimination protected by prophylactic rule of *Miranda* and its progeny, is offense specific and, thus, fact that defendant is represented by counsel on charged offense does not prevent authorities from questioning defendant about other unrelated offenses. U.S.C.A. Const.Amend. 6.

674 N.E.2d 454
285 Ill.App.3d 288, 674 N.E.2d 454, 220 Ill.Dec. 911
**(Cite as: 285 Ill.App.3d 288, 674 N.E.2d 454)**

**[4] Criminal Law 110 ⚖═══412.2(4)**

110 Criminal Law
　110XVII Evidence
　　110XVII(M) Declarations
　　　110k411 Declarations by Accused
　　　　110k412.2 Right to Counsel; Caution
　　　　　110k412.2(4) k. Absence or Denial
of Counsel. Most Cited Cases
Goal of closely related offenses exception to offense-specific Sixth Amendment right to counsel is not to shield defendant from all questioning concerning type, class, or category of offense for which charge is pending but, rather, purpose is to prevent state from interrogating defendant about distinct course of criminal conduct, one capable of supporting new charge, outside presence of defendant's attorney when fruits of successful interrogation will be admissible as substantive proof of charges upon which adversarial judicial criminal proceedings have commenced. U.S.C.A. Const.Amend. 6.

**[5] Criminal Law 110 ⚖═══412.2(4)**

110 Criminal Law
　110XVII Evidence
　　110XVII(M) Declarations
　　　110k411 Declarations by Accused
　　　　110k412.2 Right to Counsel; Caution
　　　　　110k412.2(4) k. Absence or Denial
of Counsel. Most Cited Cases
In determining applicability of closely related offenses exception to offense-specific Sixth Amendment right to counsel, three predominant factors should be examined: most importantly, court should determine whether charged and uncharged offenses were committed against same individual or entity; court should consider amount of time between acts forming basis for charged and uncharged offenses; and court should be watchful for any evidence that investigative authorities of second sovereign interrogated defendant so that second sovereign might bring similar charge based on same factual transaction. U.S.C.A. Const.Amend. 6.

**[6] Criminal Law 110 ⚖═══412.2(4)**

110 Criminal Law
　110XVII Evidence
　　110XVII(M) Declarations
　　　110k411 Declarations by Accused
　　　　110k412.2 Right to Counsel; Caution
　　　　　110k412.2(4) k. Absence or Denial
of Counsel. Most Cited Cases
Closely related offenses exception to offense-specific Sixth Amendment right to counsel does not exist to shelter defendant from otherwise proper police questioning concerning defendant's favored criminal activity or modus operandi. U.S.C.A. Const.Amend. 6.

**\*\*455 \*289 \*\*\*912** G. Joseph Weller Deputy Defender, Office of the State Appellate Defender, Thomas A. Lilien, Asst. Defender, Office of State Appellate Defender, Elgin, for Chad Wahl.
Honorable David R. Akemann, Kane County State's Attorney, St. Charles, William L. Browers Deputy Director, Diane L. Campbell, State's Attorneys Appellate Prosecutor, Elgin, for the People.
Justice HUTCHINSON delivered the opinion of the court:
Defendant, Chad Wahl, appeals the denial of his motion for a new trial and his motion to reduce or reconsider his sentence. Following a jury trial, defendant was convicted of six counts of aggravated criminal sexual abuse (720 ILCS 5/12-16(C)(1)(i) (West 1992) (now 720 ILCS Ann. 5/12-16(C)(1)(i) (Smith-Hurd Supp.1996))), one count of aggravated criminal sexual assault (720 ILCS 5/12-14(b)(1)**\*290** (West 1992) (now codified, as amended, at 720 ILCS Ann. 5/12-14(b) (Smith-Hurd Supp.1996))), and one count of attempted**\*\*456 \*\*\*913** aggravated criminal sexual assault (720 ILCS 5/8-4(a), 12-14(b)(1) (West 1992) (now codified, as amended, at 720 ILCS Ann. 5/8-4(a), 12-14(b) (Smith-Hurd Supp.1996))). Defendant was found not guilty of three counts each of aggravated criminal sexual assault and aggravated criminal sexual abuse. The trial court sentenced defendant to 4 years' imprisonment for each count of aggravated criminal sexual abuse, 10 years' imprisonment for the count of aggravated

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

674 N.E.2d 454

285 Ill.App.3d 288, 674 N.E.2d 454, 220 Ill.Dec. 911

(Cite as: 285 Ill.App.3d 288, 674 N.E.2d 454)

Page 3

criminal sexual assault, and 7 years' imprisonment for the count of attempted aggravated criminal sexual assault. All sentences were to run consecutively. In total, defendant was sentenced to a 41-year term of imprisonment. This appeal timely followed the denial of defendant's post-trial motions.

On appeal, defendant contends (1) the trial court erred by denying his motion to suppress statements made to Illinois State Police Detective Sergeant Thomas O'Donnell on March 11, 1992; (2) that concerning the psychological makeup of the complainants: (a) the State improperly presented evidence on post-traumatic stress disorder in such complainants, and (b) defendant's due process rights were violated because he was denied discovery concerning the psychological histories of the complainants; (3) the trial court erred by limiting bias impeachment of O'Donnell; (4) defendant should have received discovery concerning a civil suit filed by several of the complainants; (5) the trial court abused its discretion in imposing sentence; and (6) the trial court improperly imposed a sexual assault fine on defendant (see 730 ILCS 5/5-9-1.7(b)(1) (West 1994) (now 730 ILCS Ann. 5/5-9-1.7(b)(1) (Smith-Hurd Supp.1996))). We affirm in part and we vacate in part.

The present case arises from incidents at a home for dependent children (the Home) beginning in summer 1991 and continuing to the date of defendant's arrest. Children living in the Home are assigned to group residence halls on the basis of each child's age and sex. Each residence hall is supervised by two live-in houseparents. The houseparents have at least one day off per week; on these days, the Home provides relief houseparents. Typically, there is one female and one male houseparent. The houseparents supervise their assigned residence halls and provide the children with structure, guidance, discipline, and parental care. Additionally, the houseparents accompany the children to and from school and assist them with their homework. The houseparents function as surrogate parents and, therefore, are the children's primary care givers.

On October 20, 1990, the Home hired defendant as a houseparent. *291 For the first three months of his employment, defendant served as a houseparent in a hall for toddlers. From January to the middle of July 1991, defendant was a relief houseparent for a number of halls housing elementary school children. From July to October 1991, he was a relief houseparent in high school halls. Defendant served in this capacity until being assigned to New Jersey Hall in October 1991 as a permanent houseparent. Jane Bowen was the other permanent houseparent. New Jersey Hall is a residence hall for boys in their early teen years.

As a reward for performing their chores, the boys were permitted by Bowen and defendant to "camp-out" in the living room of New Jersey Hall on Friday and Saturday nights. Camp-outs consisted of playing video games and watching videotapes of movies rented by Bowen and defendant. The boys were then permitted to sleep on the living room floor in front of the television set. According to Bowen, the rules required one of the houseparents to sleep in the living room with the boys on camp-out nights.

O'Donnell began his investigation of defendant on March 5, 1992. Accompanying O'Donnell were Assistant State's Attorney Lynn Mirabella and Mary Heywood of the Department of Children and Family Services.

O'Donnell and defendant met at approximately 6 p.m. on March 5, 1992, in the office of the Home's superintendent. According to O'Donnell, people "were coming in and out" of the office throughout his conversation with defendant. O'Donnell informed defendant that "some students had said that he had touched them improperly." In response to defendant's query concerning who had made the allegations, O'Donnell replied he had to **457 ***914 speak to the students before discussing the allegations with defendant. Defendant responded that he would wait and speak to O'Donnell after the officer completed his discussions with the students.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

O'Donnell, along with Mirabella and Heywood, spoke with R.F. and E.S. between 6 p.m. and 8 p.m. R.F. and E.S. were interviewed separately. O'Donnell did not participate in the interview of E.S.; Mirabella and Heywood interviewed E.S.

At approximately 8 p.m. O'Donnell summoned defendant. The officer took defendant to a counselor's office. There O'Donnell began the interview by reading defendant the *Miranda* warnings (see *Miranda v. Arizona,* 384 U.S. 436, 467-74, 86 S.Ct. 1602, 1624-28, 16 L.Ed.2d 694, 720-23 (1966)) from a card. O'Donnell asked defendant if he understood his rights; defendant replied "yes." The officer then asked defendant if he wished to talk; again, defendant replied "yes." O'Donnell told defendant that R.F. and E.S. said defendant had *292 touched each of their penises; further, defendant had sucked on R.F.'s penis, according to the boy, after he had taken a shower.

While initially denying having any type of sexual contact with anyone at the Home, after approximately 30 minutes defendant admitted to having sexual contact with both R.F. and E.S. During a movie camp-out-in either June or July 1991, while defendant was a relief houseparent at Dixie Hall-he and R.F. were sleeping under the same blanket. Defendant accidentally touched R.F.'s penis. R.F.'s penis was erect and protruding through his pajamas at the time. Defendant moved his hand up and down R.F.'s penis for two or three minutes until someone bumped into defendant. Subsequently, defendant intentionally touched and stroked R.F.'s penis while the two slept under a blanket, apparently during a movie campout; defendant stated R.F. rubbed the defendant's pants at the same time. Defendant told O'Donnell he stopped after realizing what he was doing was wrong. Defendant denied sucking R.F.'s penis.

O'Donnell asked defendant if he had touched any other children in a sexual manner. According to defendant, he had touched K.W. on more than one occasion. Apparently, these incidents occurred before R.F. moved into Dixie Hall. Defendant said he and

K.W. had been lying underneath a blanket watching television and "were cuddling very close." Defendant reached down and touched K.W.'s penis. According to defendant, K.W.'s penis was erect and protruding through his pajamas. Defendant stroked K.W.'s penis for two or three minutes. Defendant stated he engaged in this sort of conduct with K.W. on another occasion. O'Donnell promised that he would inform the State's Attorney of defendant's cooperation. At the conclusion of the interview, O'Donnell arrested defendant.

On March 11, 1992, O'Donnell visited the Kane County jail to interview defendant about further information the officer had obtained from other boys. O'Donnell and defendant seated themselves in a "small" interview room. Their conversation began with small talk. According to the officer, he then read defendant the *Miranda* warnings. O'Donnell stated he asked defendant if he had an attorney. The officer testified defendant said "somebody had come by the jail, he didn't know who the person was, told him that that person represented an attorney that was going to represent [defendant]." O'Donnell rose and started to leave the interview room. On cross-examination, O'Donnell admitted he got up to leave because he believed defendant had an attorney and would not discuss the case. Before O'Donnell left the interview room, but after he had stood up to depart, he told defendant that he would not be able to tell the State's Attorney defendant had been cooperative. This was because *293 since March 5, 1992, O'Donnell had learned defendant "had not been completely truthful." Defendant replied he had been nervous and may have forgotten some things. O'Donnell said he had spoken to several other children in the interim of March 5, 1992, and March 11, 1992. In reply, defendant asked with whom the officer had spoken. O'Donnell testified that he told defendant he "had talked to [T.W.], [C.M.] and other children." According to O'Donnell, defendant replied, "[T.W.] was not one of them." Defendant also expressed a desire to get out of **458 ***915 jail and a need for counseling. He also opined that "at least I didn't

674 N.E.2d 454
285 Ill.App.3d 288, 674 N.E.2d 454, 220 Ill.Dec. 911
(Cite as: 285 Ill.App.3d 288, 674 N.E.2d 454)

Page 5

hurt any of them." O'Donnell replied he thought defendant had hurt them psychologically. Defendant then "hung his head" and looked downward.

Defendant's recollection of the March 11, 1992, meeting differed somewhat from O'Donnell's. Defendant testified O'Donnell did not read defendant the *Miranda* warnings. The officer walked into the interview room and declared defendant had not been truthful. Defendant asserted, "Well, I want to talk to my attorney." While getting up to leave, O'Donnell asked defendant if he could afford an attorney. Defendant replied he did not know. O'Donnell then asked if defendant had an attorney yet. Defendant said he thought he had been assigned an attorney and that somebody had visited him in jail.

Before trial, defendant filed a motion to suppress all statements he made after being taken into custody on March 5, 1992. The trial court ruled that all of the March 5, 1992, statements were admissible. Defendant does not contest this ruling. As for the March 11, 1992, statements, the court suppressed any statements relating to the charges upon which defendant had already been incarcerated. The trial court stated:

"My findings of fact are * * * that * * * defendant was represented by the attorneys from the Public Defender's Office. That number two, [defendant] advised [O'Donnell] prior to making any statements that in fact [defendant] is represented by an attorney. Number three, I believe that [O'Donnell] made the statements before leaving in an attempt to elicit additional incriminating comments from * * * defendant."

After making these findings, the court permitted the parties to submit memoranda of law on the propriety of O'Donnell's questioning in light of the court's findings. After reading the memoranda, the court allowed any statements regarding charges initiated after March 11, 1992. Based on the report of proceedings for March 4, 1993, the trial court seemingly based its ruling exclusively on sixth amendment grounds (see, *e.g., Maine v. Moulton*, 474

U.S. 159, 180, 106 S.Ct. 477, 489, 88 L.Ed.2d 481, 498 (1985) (sixth amendment right to *294 counsel attaches to only those charges pending at the time evidence is elicited from a defendant)), notwithstanding the fifth amendment arguments set forth in the parties' memoranda.

J.C.(I) (two of the complainants in the present case have the initials "J.C."; for the sake of clarity they will be referred to as J.C.(I) and J.C. (II)) was born on August 2, 1982. J.C.(I) testified defendant had been his relief parent at New Jersey Hall in summer 1991. J.C.(I) stated that one night he entered defendant's room in New Jersey Hall and defendant put his hand on J.C.(I)'s penis and stroked up and down. This continued for "five to ten minutes." According to J.C.(I), this type of conduct occurred "[f]ive to four or so" times.

Defendant continued his sexual contact with J.C.(I) after defendant became a permanent houseparent in New Jersey Hall. J.C.(I) testified defendant "put his finger up my butt" four or five times. On at least one occasion, defendant wiped a liquid on J.C.(I)'s anus before inserting his finger. These incidents occurred in defendant's room in New Jersey Hall. Defendant also stroked J.C. (I)'s penis during a movie camp-out. At approximately 11 p.m., J.C.(I) entered defendant's room. At defendant's behest, J.C.(I) pulled down his pants and lay on his stomach. Defendant again used a liquid of some type on J.C.(I)'s anus. J.C.(I) felt defendant's weight on his back. J.C. thought defendant was attempting to insert his penis in J.C.(I)'s anus. J.C.(I) felt a pain and pulled away. He observed that defendant had taken off his shorts and he had an erection. J.C.(I) dressed and left defendant's room. On a different night, defendant told J.C.(I) to pull down his pants and J.C.(I) refused. Defendant repeated the order and J.C.(I) complied. Defendant then sucked on J.C.(I)'s penis until he ejaculated. J.C.(I) testified this occurred on one other occasion.

J.C.(I) stated he did not report these events prior to March 5, 1992, because he was afraid. Once, J.C.(I) testified, defendant had said that if J.C.(I) informed

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

674 N.E.2d 454

285 Ill.App.3d 288, 674 N.E.2d 454, 220 Ill.Dec. 911

**(Cite as: 285 Ill.App.3d 288, 674 N.E.2d 454)**

on defendant he would hurt J.C.(I). His fear only subsided**459 ***916 after defendant was removed from the Home.

S.W. was born on September 1, 1979. He had lived in New Jersey Hall during 1991 and 1992. S.W. testified defendant had first touched S.W. sexually while defendant was serving as a relief houseparent in New Jersey Hall. This first incident occurred during a camp-out. According to S.W., he and the other children had gathered around the television set to watch the film, "Who Framed Roger Rabbit." S.W., having just taken a shower, was lying on the floor wearing underwear, shorts, and socks. At about 8 p.m. or 8:30 p.m., defendant lay down beside S.W., placed his blanket over S.W.'s blanket, and started touching S.W.'s penis through his shorts. S.W. jumped up, ran away, and hid from defendant. Defendant located S.W.'s hiding place, picked *295 him up, carried him back to the living room, and laid him down. Defendant again placed the blankets over himself and S.W. S.W. fell asleep at approximately 12 a.m. When he awoke, S.W. discovered defendant was stroking S.W.'s penis.

According to S.W., defendant continued to have sexual contact with S.W. after defendant became a permanent houseparent at New Jersey Hall. S.W. described a Boy Scout camping trip on which defendant, another houseparent, and the Home's dean, Joseph Dinges, took the children. S.W. thought Dinges was in his tent doing paperwork. S.W. and several other children were sleeping around a campfire. Defendant unzipped S.W.'s "camping bag," reached under his shorts, and began to stroke his penis. S.W. fell asleep. Returning from the camping trip by bus, S.W. took a seat in the back of the bus. Defendant and another child joined S.W. The three took turns playing a hand-held video game. On cross-examination S.W. stated defendant touched S.W.'s penis while they sat on the bus. S.W. testified the other child had left the back of the bus to talk with "some kids up front."

S.W. also testified defendant touched him sexually while S.W. was in his dorm room. This incident oc-

curred on a Saturday night after defendant was a permanent houseparent. Defendant sat on S.W.'s bed. According to S.W., defendant "said he was cold so he got under my bedspread." S.W. got out of bed, went to the rest room, and left defendant talking to the other children in the dorm room. When S.W. returned from the rest room, defendant sat up on S.W.'s bed. S.W. climbed back into bed; defendant climbed back into S.W.'s bed. Defendant began touching S.W.'s penis through his clothes. Again, S.W. got out of bed and left the dorm room.

S.W. related an incident occurring during a movie camp-out in fall 1991. After getting a drink, S.W. lay down behind the rest of the children near the couch. Defendant was lying behind S.W.; S.W. fell asleep. When S.W. awoke, defendant had reached inside S.W.'s clothes and was touching his penis. S.W. testified that he tried to move away. Defendant prevented this by holding S.W. down. S.W.'s shorts and underwear were pulled down by defendant, who moistened his finger, and inserted his finger in S.W.'s anus. S.W. testified this hurt. He pushed defendant away. According to S.W., defendant said "he was trying to loose me up [*sic* ] and everything." S.W. got up and moved to the couch to sleep. S.W. stated this type of conduct occurred twice.

S.W. testified to another specific incident occurring approximately a week or two before New Year's Eve during a "movieless" camp-out. S.W. and the other children had been playing video games on the *296 television in the living room. S.W. fell asleep under his blanket. Upon awakening, S.W. discovered his shorts were around his ankles and defendant was sucking on S.W.'s penis. Defendant also engaged in this type of conduct with S.W. on the Saturday night before defendant was arrested.

S.W. testified he did not tell Bowen about defendant's conduct until after he had been arrested because he was afraid. Defendant threatened S.W. According to S.W., the initial threat occurred the first time defendant touched S.W. in a sexual manner. S.W. testified, "[defendant] told me that if I told on

him, that no one would believe me. That everyone would think I was lying. And he said that he knew where my family lives because he has my records and that if I told **460 ***917 anybody that he'd checked [*sic* ] on my family." On cross-examination, S.W. stated he was touched more than 40 times in a manner he did not like.

J.C.(II) was born on December 28, 1982. J.C.(II) moved into the Home in summer 1991. After three days in Arizona Hall, J.C.(II) was moved to Dixie Hall. Over J.C.(II)'s eight months at Dixie Hall, defendant served as a relief houseparent "about eight times." J.C.(II) testified he was touched by defendant during defendant's fourth stint as a relief houseparent. The children were in the living room watching "[a]n airplane movie." J.C.(II) fell asleep on the living room couch. When he awoke, defendant was lying behind the boy on the couch. Defendant had his hands in J.C.(II)'s shorts and was touching his penis. This continued for two minutes. According to J.C. (II), defendant asked if his actions bothered J.C.(II). He responded it did bother him, left the couch, and went upstairs to his room.

C.M. was born on July 5, 1979. C.M. moved into Dixie Hall in fall 1991 and was living there in November 1991. Defendant was one of several relief houseparents during C.M.'s stay in Dixie Hall. C.M. testified that in either June or July 1991, defendant stroked his penis. C.M. and the rest of the children had gathered in the living room to watch the film, "Rambo 3." Defendant was lying on the couch. When the film began, C.M. moved from a chair to the couch to be next to defendant. C.M. testified he moved "[b]ecause I liked [defendant] and I was close to him." Defendant and C.M. were underneath a blanket when defendant reached down C.M.'s shorts and underwear and began stroking his penis. This continued for three to five minutes until C.M. ejaculated. He then went upstairs to change clothes. According to C.M., defendant said he had never done that sort of thing before and that he was not gay. C.M. testified to having observed defendant and another child, G.J., "wrestle around with a

cover over them." C.M. also stated he heard the sound of "underwear snapping" coming from the vicinity of defendant and G.J.

*297 R.F. was born on January 30, 1982. R.F. lived in Dixie Hall in summer 1991. According to R.F., defendant often served as a relief houseparent. In June 1991, the regular Dixie Hall houseparents took a 12-day vacation. During this period, defendant served as the sole houseparent. At approximately 3 p.m. of the second day of defendant's stint as relief houseparent, he and several of the children were gathered in the living room watching television. R.F. testified he was lying on the floor. Defendant entered the living room and covered himself and R.F. with a blanket. R.F. testified that defendant began to rub R.F.'s "foreskin up and down." This type of conduct was repeated on a separate occasion at sometime during the 12-day period.

Additionally, R.F. stated defendant had put his mouth on R.F.'s penis after he had showered. This occurred in the basement. R.F. had finished showering. Defendant then dried R.F. off using a towel. According to R.F., defendant laid R.F. on a table. Defendant then placed his mouth on R.F.'s penis.

K.W. was born on January 13, 1980. K.W. lived in Dixie Hall in summer 1991. During this summer, defendant served as a relief houseparent during the vacation of the regular Dixie Hall houseparents. According to K.W., he, several of the other children, and defendant were watching a film in the living room. It was evening. K.W. was lying down on his side in front of the couch. Defendant was lying in front of K.W. K.W. was wearing his pajamas. K.W. testified defendant "felt my penis." When asked how defendant did this, K.W. responded, "Moving his hand up and down." Defendant then whispered to K.W., "Don't tell anybody." K.W. stated defendant repeated this sort of conduct "two or three" times following the initial incident.

Although nine complainants testified for the State, we have only summarized the testimony of those

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

674 N.E.2d 454

285 Ill.App.3d 288, 674 N.E.2d 454, 220 Ill.Dec. 911

**(Cite as: 285 Ill.App.3d 288, 674 N.E.2d 454)**

the jury determined had been abused or assaulted by defendant. Additional facts will be set forth within the body of the opinion as needed.

Defendant first argues that the trial court erred by denying his motion to suppress the statements he made to O'Donnell on March **461 ***918 11, 1992. Defendant bases this argument on both his sixth amendment right to counsel and his fifth amendment privilege against self-incrimination. We examine each basis in turn.

[1][2][3] Defendant asserts that his March 11, 1992, statements were elicited in violation of his sixth amendment right to counsel. A defendant represented by counsel may not be questioned concerning charges upon which adversarial judicial criminal proceedings have commenced. See, e.g., *People v. Crane,* 145 Ill.2d 520, 531, 165 Ill.Dec. 703, 585 N.E.2d 99 (1991), citing *298 *McNeil v. Wisconsin,* 501 U.S. 171, 175-76, 111 S.Ct. 2204, 2207, 115 L.Ed.2d 158, 166-67 (1991). Further, a defendant does not waive the sixth amendment right to counsel when a police officer reads the *Miranda* warnings to the defendant, who then acquiesces to the officer's questioning. See *Michigan v. Jackson,* 475 U.S. 625, 631-35, 106 S.Ct. 1404, 1408-11, 89 L.Ed.2d 631, 639-40 (1986). However, the sixth amendment right to counsel-unlike the fifth amendment privilege against self-incrimination protected by the prophylactic rule of *Miranda* and its progeny-is offense specific. Therefore, simply because a defendant is represented by counsel on a charged offense does not prevent the authorities from questioning the defendant about other unrelated offenses. See, e.g., *People v. Maxwell,* 148 Ill.2d 116, 128-29, 170 Ill.Dec. 280, 592 N.E.2d 960 (1992).

Under a traditional sixth amendment analysis, O'Donnell's conduct during the March 11, 1992, interview did not violate defendant's right to counsel. On March 11, 1992, defendant had already been charged with aggravated criminal sexual abuse against both R.F. and K.W. Therefore, defendant's comments that "[T.W.] was not one of them" and "at least I didn't hurt any of them" were admissible

as to all charges other than those already pending concerning R.F. and K.W. The trial court ruled accordingly.

However, defendant argues that the offenses against J.C.(I), C.M., S.W., R.F., J.C.(II), and K.W. were so closely related that defendant's sixth amendment right to counsel attached to the uncharged offenses. The Illinois Supreme Court has interpreted the United States Supreme Court's decision in *Moulton* as implicitly standing for the proposition that the "sixth amendment rights of one formally charged with an offense extend to offenses *closely related* to that offense and for which a defendant is subsequently formally accused." (Emphasis added.) *People v. Clankie,* 124 Ill.2d 456, 463, 125 Ill.Dec. 290, 530 N.E.2d 448 (1988); see also *United States v. Cooper,* 949 F.2d 737, 743 (5th Cir.1991) (stating the standard as being whether the charged and uncharged offenses are "inextricably intertwined"). Neither the degree nor the nature of the closeness of the charged and uncharged offenses has been set forth by either the Illinois or the United States Supreme Court. *Clankie,* 124 Ill.2d at 463-64, 125 Ill.Dec. 290, 530 N.E.2d 448 (failing to state an evaluative standard because "even if [-] for exclusion of the evidence regarding the subsequently charged offense [-] the two offenses must be *extremely* closely related, the required relationship exists in this case" (emphasis in original)).

[4] It is vital to understand precisely the interest protected by the closely related offenses exception to the offense-specific sixth amendment right to counsel. The exception has been adopted in one form or *299 another by a number of both state and federal courts. See *United States v. Kidd,* 12 F.3d 30, 33 (4th Cir.1993); *Hendricks v. Vasquez,* 974 F.2d 1099, 1104-05 (9th Cir.1992); *United States v. Carpenter,* 963 F.2d 736, 740-41 (5th Cir.1992); *United States v. Hines,* 963 F.2d 255, 257-58 (9th Cir.1992); *Cooper,* 949 F.2d at 743-44; *United States v. Mitcheltree,* 940 F.2d 1329, 1342-43 (10th Cir.1991); *United States v. Richardson,* 837 F.Supp. 570, 574-75 (S.D.N.Y.1993); *United States*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

674 N.E.2d 454

Page 9

285 Ill.App.3d 288, 674 N.E.2d 454, 220 Ill.Dec. 911
**(Cite as: 285 Ill.App.3d 288, 674 N.E.2d 454)**

*v. Louis,* 679 F.Supp. 705, 709-10 (W.D.Mich.1988); *State v. Tucker,* 137 N.J. 259, 278, 645 A.2d 111, 121 (1994); *In re Pack,* 420 Pa.Super. 347, 355-56, 616 A.2d 1006, 1010-11 (1992); see also *Whittlesey v. State,* 340 Md. 30, 50-57, 665 A.2d 223, 232-36 (1995) (providing an excellent overview of this issue, while declining to decide whether the sixth amendment right to counsel may ever attach to an uncharged offense); 1 W. LaFave & J. Israel, Criminal Procedure § 6.4(e), at 96, 97 **462 ***919 n. 90.2 (Supp.1991) (discussing *Clankie* in terms of *Moulton*). However, few of these cases discuss the goal of the closely related offenses exception. We do not view the goal as being shielding a defendant from all questioning concerning a type, class, or category of offense for which a charge is pending. See *Kidd,* 12 F.3d at 33 (notwithstanding defendant's arrest on July 2, 1992, for selling cocaine base to government informants, exception did not apply to defendant's sale of cocaine base to a different undercover informant on August 26, 1992, while defendant was out on bond awaiting trial on the July 2, 1992, charge); *Hines,* 963 F.2d at 257 (stating that when the time, place, and persons involved are all different, a charged firearm possession offense is not closely related to a subsequently charged firearm possession offense). Rather, the true purpose of *Clankie* 's exception is to prevent the State from interrogating a defendant about a distinct course of criminal conduct-one capable of supporting a new charge-outside of the presence of the defendant's attorney, when the fruits of a successful interrogation will be admissible as substantive proof of the charges upon which adversarial judicial criminal proceedings have commenced. Put another way, *Clankie* prohibits interrogation of a defendant on an uncharged criminal offense if the interrogation functions as a continuation of the investigation of the factual transaction forming the basis of the previously charged offense.

[5] There is no bright line test for whether the closely related offenses exception applies. Our survey of the cases discussing the exception indicates that three predominant factors should be examined.

First, a court should determine whether the charged and uncharged offenses were committed against the same individual or entity. Second, a court should consider the amount of time between the acts *300 forming the basis for the charged and uncharged offenses. The briefer the time period between the acts giving rise to the charged and uncharged offenses, the greater the likelihood the facts were part of the same factual transaction. This, in turn, militates in favor of finding that the sixth amendment right to counsel has attached to the uncharged offense. Third, a court should be watchful for any evidence that the investigative authorities of a second sovereign interrogated the defendant-in an attempt to elicit evidence concerning the facts forming the basis of an offense charged by the first sovereign-so the second sovereign might bring a similar charge based on the same factual transaction. A discussion of these factors should form the basis of a court's analysis of the closely related offenses exception.

The most important of the factors is the identity of the victims or targets of the offenses. If the uncharged offense was committed against the same individual or entity, a strong possibility exists that the closely related offenses exception may apply. See *Brewer v. Williams,* 430 U.S. 387, 389-98, 97 S.Ct. 1232, 1235-38, 51 L.Ed.2d 424, 431-36 (1977) (holding that use of defendant's admission that he killed his abductee was violative of sixth amendment right to counsel where admission was made after defendant was indicted for abducting the victim and before defendant's attorney met with defendant); *Clankie,* 124 Ill.2d at 457, 466, 125 Ill.Dec. 290, 530 N.E.2d 448 (applying exception where defendant was convicted of three instances of burglarizing the same person's home).

*In re Pack* provides a particularly good illustration of the importance of the identity of the victims or targets of the offenses. In *In re Pack* the defendant was arrested on March 22, 1991, for theft, receiving stolen property, and criminal conspiracy. The defendant allegedly stole clothing that morning from a store located at 135 South 52nd Street. After being

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

674 N.E.2d 454                                                    Page 10
285 Ill.App.3d 288, 674 N.E.2d 454, 220 Ill.Dec. 911
(Cite as: 285 Ill.App.3d 288, 674 N.E.2d 454)

read the *Miranda* warnings, the defendant asserted his right to remain silent. Counsel was appointed. On April 1, 1991, the State obtained a warrant for the defendant's arrest, adding the charge of burglary to those pending on the March 22, 1991, incident. Once again the defendant was read the *Miranda* warnings. However, this time he made a statement incriminating himself in the March 22, 1991, break-in; additionally, the statement contained an admission by the defendant that he had participated in an earlier break-in at a separate location on South 52nd Street.

**463 [6] ***920 The court held that the April 1, 1991, interrogation had violated defendant's sixth amendment right to counsel. *In re Pack,* 420 Pa.Super. at 355, 616 A.2d at 1010. The court stated "the Sixth Amendment right to counsel, which is offense specific, [applies] to all the offenses *301 arising from the same incident for which a defendant is charged." *In re Pack,* 420 Pa.Super. at 356, 616 A.2d at 1010-11. "To hold otherwise, would allow the [State] to circumvent the Sixth Amendment right to counsel merely by charging a defendant with additional related crimes." *In re Pack,* 420 Pa.Super. at 356, 616 A.2d at 1011. We believe it is this circumvention that the closely related offenses exception is designed to prevent. Simply because a defendant repeatedly commits the same type of offense in the same fashion does not alter the offense-specific nature of the sixth amendment right. The exception does not exist to shelter a defendant from otherwise proper police questioning concerning a defendant's favored criminal activity or *modus operandi.* In this context, we note the *In re Pack* court did not require the suppression of the defendant's comments concerning the earlier break-in on South 52nd Street. *In re Pack,* 420 Pa.Super. at 356, 616 A.2d at 1011.

We hold that the charges filed after O'Donnell's March 11, 1991, meeting with defendant were not closely related to the pre-March 11, 1991, charges. Each of the post-March 11, 1991, charges concerned different victims from the pre-March 11,

1991, charges. Additionally, defendant's offenses were committed over a time span ranging from early June 1991 to March 1992. The testimony establishes beyond a reasonable doubt that the instances of defendant's abuse and assault were neither continuous nor simultaneous. They were interspersed among the ordinary activities of life at the Home: school, sports, chores, films, and camping trips. Finally, we note that the present case does not implicate the problem of separate sovereigns attempting to bring similar charges against a defendant based on the same operative facts.

[The following material is nonpublishable under Supreme Court Rule 23].

Defendant also argues that the March 11, 1991, statements were elicited in violation of his fifth amendment privilege against self-incrimination. We disagree. The trial court found that O'Donnell was advised by defendant that he had an attorney. However, the court did not find that defendant ever invoked his right to have an attorney present during questioning. O'Donnell and defendant offered sharply conflicting testimony on this crucial fact. In denying defendant's motion to suppress, it is apparent that the trial court chose to credit O'Donnell's version of the March 11, 1991, meeting. We may not disturb this determination unless the trial court's finding was against the manifest weight of the evidence. See *People v. Silas,* 278 Ill.App.3d 400, 405, 215 Ill.Dec. 432, 663 N.E.2d 443 (1996), citing *In re W.C.,* 167 Ill.2d 307, 329, 212 Ill.Dec. 563, 657 N.E.2d 908 (1995).

O'Donnell's version of the March 11, 1991, meeting does not demonstrate defendant invoked his right to counsel. At best, the version of events recalled by O'Donnell demonstrates that defendant made an ambiguous comment concerning whether he wanted an attorney present during the meeting. We will not equate defendant's act of informing O'Donnell an attorney had been appointed with an invocation of the right to have that attorney present during custodial interrogation. This is because a defendant must expressly request an attorney to trigger the po-

lice officer's duty to cease questioning. *United States v. Davis*, 512 U.S. 452, ----, 114 S.Ct. 2350, 2356-57, 129 L.Ed.2d 362, 373 (1994). An ambiguous or equivocal request for counsel does not require the officer to clarify whether the defendant is actually invoking the right to have counsel present during custodial interrogation. *People v. Oaks*, 169 Ill.2d 409, 452, 215 Ill.Dec. 188, 662 N.E.2d 1328 (1996), citing *Davis*, 512 U.S. at ----, ----, 114 S.Ct. at 2352-53, 2357, 129 L.Ed.2d at 368, 373 (holding that defendant's question to investigating agents, "Maybe I should talk to a lawyer," was not a request for counsel).

Defendant also asserts that he did not knowingly waive his rights under *Miranda*. Again, we disagree. Whether there has been a knowing waiver is determined by examining the facts and circumstances of each case. *Silas*, 278 Ill.App.3d at 405, 215 Ill.Dec. 432, 663 N.E.2d 443, citing *People v. Bernasco*, 138 Ill.2d 349, 368, 150 Ill.Dec. 155, 562 N.E.2d 958 (1990). On March 11, 1991, defendant was read the *Miranda* warnings before making the incriminating statements. Neither O'Donnell nor defendant testified defendant had any trouble communicating his thoughts or understanding the statements of others. There is no allegation defendant was under the influence of alcohol or a controlled substances. Also, defendant had been arrested only six days before the March 11, 1991, questioning. On March 5, 1991, he had been read the *Miranda* warnings before O'Donnell began his questioning. Defendant's arrest must have made him aware of the seriousness of his situation, the possible consequences of waiving his rights, and most importantly, the fact that he possessed the right to have an attorney present. Under the facts of the present case, we do not believe a police officer's failure to ask a defendant whether he understood the *Miranda* warnings before engaging in interrogation forecloses the possibility of a knowing and intelligent waiver. See *Patterson v. Illinois*, 487 U.S. 285, 288-89, 292-94, 108 S.Ct. 2389, 2392-93, 2394-96, 101 L.Ed.2d 261, 269-70, 272-73 (1988) (waiver held to be knowing and intelligent where

defendant was read *Miranda* warnings twice within a two-day period and after each instance gave incriminating statements, notwithstanding fact police officer did not ask defendant whether he understood his rights before making second incriminating statement). In holding that defendant made a knowing waiver, we are mindful that *Miranda* and its progeny protect defendants against foregoing their fifth amendment right to counsel if they are unaware that they are entitled to such a protection; the fifth amendment does not shield defendants from unwise or tactically foolish waivers of the right to counsel during custodial interrogation. See 1 W. LaFave & J. Israel, Criminal Procedure § 6.9(b), at 527 (1984).

Defendant's second contention is that the trial court erred in its handling of the evidence concerning the psychological makeup of the complainants. Specifically, defendant argues: (a) the State improperly presented evidence on post-traumatic stress syndrome in such complainants; and (b) defendant's due process rights were violated because he was denied discovery concerning the psychological histories of the complainants. We discuss each argument in turn.

Defendant asserts that psychotherapist Gabriella Cohen (Cohen) impermissibly gave general testimony concerning the nature of post-traumatic stress syndrome and the characteristics of children who are sexually abused. However, the State argues-and defendant concedes-that trial counsel never objected to Cohen's testimony. To preserve an issue for review a contemporaneous objection must be made and the alleged error must be recited in a post-trial motion. See, *e.g.*, *People v. Banks*, 161 Ill.2d 119, 143, 204 Ill.Dec. 107, 641 N.E.2d 331 (1994). Defendant failed to make a contemporaneous objection to Cohen's testimony. Neither was the fact Cohen was permitted to testify listed in defendant's motion for a new trial. Therefore, this issue is waived. Thus, the question becomes whether the plain error rule should be applied. The plain error rule is applicable if the evidence was closely bal-

674 N.E.2d 454

285 Ill.App.3d 288, 674 N.E.2d 454, 220 Ill.Dec. 911

(Cite as: 285 Ill.App.3d 288, 674 N.E.2d 454)

anced, or the alleged error was so egregious that defendant was denied a fundamentally fair trial. See, e.g., *People v. Williams,* 165 Ill.2d 51, 62, 208 Ill.Dec. 341, 649 N.E.2d 397 (1995).

We hold that the plain error rule is applicable to the present case. Initially, we reject the contention that the evidence was closely balanced because the jury acquitted defendant of six of the 14 counts brought against him. However, we find that Cohen's testimony powerfully buttressed that of the complainants. Additionally, we must view Cohen's testimony in conjunction with the testimony of various witnesses who testified that the complainants exhibited many of the symptoms of sexual abuse identified by the psychotherapist. In this context, the potential damage of Cohen's testimony becomes evident. Therefore, notwithstanding defendant's waiver, we will examine the propriety of Cohen's testimony.

The use of expert testimony concerning post-traumatic stress syndrome in cases involving illegal sexual acts is controlled by 725 ILCS 5/115-7.2 (West 1994) (now 725 ILCS Ann. 5/115-7.2 (Smith-Hurd Supp.1996)). Section 115-7.2 provides that "[i]n a prosecution for an illegal sexual act perpetrated upon a victim, * * * testimony by an expert, qualified by the court relating to any recognized and accepted form of post-traumatic stress syndrome shall be admissible as evidence." 725 ILCS 5/115-7.2 (West 1994) (now 725 ILCS Ann. 5/115-7.2 (Smith-Hurd Supp.1996)). However, our supreme court has held that the State may not introduce the testimony of a section 115-7.2 examining expert if the victim refuses to consent to an examination by the defendant's expert. *People v. Wheeler,* 151 Ill.2d 298, 312, 176 Ill.Dec. 880, 602 N.E.2d 826 (1992). The court stated that "[i]n any case, the State may still introduce rape trauma evidence through the opinions of nonexamining experts." *Wheeler,* 151 Ill.2d at 312, 176 Ill.Dec. 880, 602 N.E.2d 826.

Essentially, defendant argues Cohen should only have been allowed to testify after a review of the reports on the complainants and observing them at

trial. We disagree. Adopting defendant's position would greatly reduce the usage of section 115-7.2 expert testimony. This would be contrary to the legislature's intent. See *People v. Turner,* 241 Ill.App.3d 236, 243-44, 181 Ill.Dec. 655, 608 N.E.2d 906 (1993) (stating that legislature amended section 115-7.2 to allow those outside of the medical profession to testify as experts, thereby demonstrating an intent to expand the usage of such testimony). Defendant argues that only those experts who have reviewed the reports and trial testimony should be allowed to testify, yet the court in *Wheeler* stated "this is clearly not the preferred method." *Wheeler,* 151 Ill.2d at 309, 176 Ill.Dec. 880, 602 N.E.2d 826. "An expert who has personally examined a victim is in a better position to render an opinion than is an expert who has not done so." *Wheeler,* 151 Ill.2d at 309-10, 176 Ill.Dec. 880, 602 N.E.2d 826, citing Note, *Defining the Boundaries of Admissible Expert Psychological Testimony on Rape Trauma Syndrome,* 1989 U.Ill.L.Rev. 691, 733 n. 320 (stating that personal examinations are "necessary prerequisite[s] to diagnosing Rape Trauma Syndrome or Post-Traumatic Stress Disorder"). We find that *Wheeler,* when considered in light of the legislature's intention to allow the admission of expert testimony on post-traumatic stress syndrome in sexual offense trials, contemplates the introduction of testimony such as Cohen's. Therefore, we hold that the trial court did not err in allowing Cohen to testify.

Defendant also argues his due process rights were violated because he was denied discovery concerning the psychological histories of the complainants. Defendant issued a subpoena *duces tecum* to the Home. Defendant requested the production of a variety of documents. These included the complainants' Dean's office/student files, health records, student services files (including but not limited to psychological evaluations), in-service/staffing reports, and school records (including the complainants' (a) disciplinary records from the time defendant was hired by the Home; (b) course selections; and (c) grades from the 1989-90 to 1991-92 school years).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The State moved to quash the subpoena *duces tecum* on the grounds that defendant's request was overly broad and sought privileged documents that were irrelevant and immaterial.

On June 18, 1993, the trial court appointed attorney Carol Grahn-Hays (Grahn-Hays) as the complainants' guardian *ad litem.* On July 16, 1993, Grahn-Hays joined the State's motion to quash. Defense counsel-with the guardian present-made his arguments to the trial court concerning the possible relevancy of the requested documents. The court stated "some of the issues [defense counsel has] raised [do] sound relevant." The trial court then directed Grahn-Hays to review the documents to determine what should and should not be protected. Additionally, the court stated any documents the guardian deemed should be inspected *in camera* would be so examined.

On August 27, 1993, Grahn-Hays told the court she "had a chance to review all of the records at [the Home]." The guardian stated that the "majority of those records are not relevant." After hearing additional argument, the court quashed the subpoena *duces tecum* in reference to the Dean's office/student files, student services files, and in-service/staffing reports; the court denied the motion to quash on the school records. The court ordered an *in camera* inspection of the student incident reports and the health records.

Sometime between August 27, 1993, and September 24, 1993, the trial court and Grahn-Hays reviewed approximately 5,000 documents *in camera.* The court stated that it had made its decisions based on its *in camera* review. The court emphasized to defense counsel, "I looked at [the documents] pursuant to a very liberal * * * interpretation of the order that I gave that all the documents that are * * * relevant, everything that you've asked for. And I emphasize a very liberal interpretation on my part when I went through everything and those documents."

Defendant contends his lack of complete access to the complainants' records prevented him from effectively cross-examining Cohen. More specifically, defendant argues that full access to complainants' records-including psychological records-would have permitted him to offer an alternative explanation for the symptomatology demonstrated by the complainants as set forth by the various witnesses called by the State. However, the record on appeal does not contain the complainants' records. Without these, it is impossible for us to review the trial court's decisions concerning the records. The appellant has the burden of providing a sufficiently complete record of the proceedings at trial, and, in the absence of such a record, it will be presumed that the order entered by the trial court conformed to the law and had a sufficient factual basis. *Haudrich v. Howmedica, Inc.,* 169 Ill.2d 525, 546-47, 215 Ill.Dec. 108, 662 N.E.2d 1248 (1996), citing *Foutch v. O'Bryant,* 99 Ill.2d 389, 391-92, 76 Ill.Dec. 823, 459 N.E.2d 958 (1984). Defendant could have requested that the trial court seal the complainants' records and make them a part of the appellate record pending the final disposition of this cause. Having failed to do this, we must presume that the trial court did not abuse its discretion in denying defendant complete access to the complainants' records.

Defendant's third contention is that the trial court erred by limiting bias impeachment of O'Donnell. O'Donnell and defendant had been involved in a previous sexual abuse case involving several of the Home's personnel. Defendant and O'Donnell had come into contact with each other during the course of the previous investigation. Defendant alleged these contacts had been less than amicable and defendant eventually began filing complaints against O'Donnell. The trial court granted the State's pretrial motion *in limine,* thereby excluding all evidence of the prior sexual abuse case. The trial court did permit defendant to question the complainants about any biases or prejudices they might hold against defendant. Additionally, the trial court permitted defendant to delve into any possible animosities that existed between defendant and O'Donnell.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

674 N.E.2d 454
285 Ill.App.3d 288, 674 N.E.2d 454, 220 Ill.Dec. 911
(Cite as: 285 Ill.App.3d 288, 674 N.E.2d 454)

However, during the trial the court only permitted defendant to question O'Donnell concerning his awareness that defendant had filed complaints against the officer with Home officials.

The scope of cross-examination may be restricted by a trial court. See, *e.g., People v. Bridges,* 273 Ill.App.3d 773, 779, 210 Ill.Dec. 121, 652 N.E.2d 1097 (1995). The decision to restrict cross-examination is entrusted to the trial court's sound discretion and will be affirmed absent an abuse of discretion resulting in manifest prejudice to the defendant. See, *e.g., Bridges,* 273 Ill.App.3d at 779-80, 210 Ill.Dec. 121, 652 N.E.2d 1097. In reviewing a trial court's ruling on the scope of cross-examination, the focus must be on whether constitutionally sufficient avenues of cross-examination were open to the defendant, not on which avenues were closed. *People v. Weatherspoon,* 265 Ill.App.3d 386, 393, 202 Ill.Dec. 112, 637 N.E.2d 651 (1994).

The State and defendant presented sharply differing views of the relationship between O'Donnell and defendant. On cross-examination, O'Donnell testified he was unaware defendant had filed complaints against the officer. Defendant was permitted to question O'Donnell concerning any hostilities between the two men; O'Donnell repeatedly denied there had been any animosity between he and defendant. Mirabella corroborated this portion of O'Donnell's testimony; she stated she had not noticed any animosity or irritability between defendant and O'Donnell on March 5, 1992. Bowen countered during her testimony that O'Donnell and defendant did not have a "good rapport." Bowen also stated that during the March 5, 1992, questioning O'Donnell was "very self assured, very confident"; however, she did not indicate the officer was antagonistic towards defendant in any way. Additionally, defendant testified his relationship with O'Donnell was "not a very good one." Defendant also stated he had filed complaints against O'Donnell "[a]pproximately once a week."

We hold the trial court did not abuse its discretion

in limiting the scope of cross-examination of O'Donnell. Defendant was permitted to offer-and indeed did offer-testimony demonstrating O'Donnell might have been biased, or even prejudiced, against defendant. The State presented the relationship between the two men as friendly, nothing out of the ordinary; defendant depicted O'Donnell as hostile towards defendant because of his complaints directed against O'Donnell's job performance. The jurors were free to choose between these competing portrayals. That choice likely turned on how credible the jurors found the testimony of Mirabella, O'Donnell, Bowen, and defendant. The credibility of witnesses and the weight given to their testimony are findings entrusted exclusively to the discretion of the jury. See, *e.g., People v. Rivera,* 166 Ill.2d 279, 291, 209 Ill.Dec. 767, 652 N.E.2d 307 (1995). We may not set aside such findings unless no rational finder of fact could have found beyond a reasonable doubt the essential elements of the offense. *People v. Peeples,* 155 Ill.2d 422, 487, 186 Ill.Dec. 341, 616 N.E.2d 294 (1993). We find the jury could rationally have found either the State's or defendant's depiction of O'Donnell credible.

Additionally, we disagree with defendant's contention that the credibility of O'Donnell was crucial to the State's case. The State presented the testimony of six eyewitnesses to the crimes for which defendant was convicted. Therefore, this is not a situation in which it was necessary for the jurors to believe the officer's testimony to convict. On the contrary, provided the complainant's testimony was found credible, the jurors could have completely discounted O'Donnell's testimony and still returned the identical verdicts. Hence, even if the trial court had erred and abused its discretion in limiting cross-examination, such an error would be harmless. See, *e.g., People v. Cedeno,* 263 Ill.App.3d 257, 262, 200 Ill.Dec. 708, 635 N.E.2d 1047 (1994) (holding that an alleged error is harmless if the reviewing court determines that a trial without the alleged error would produce the same result).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Defendant's fourth contention is that he should have received discovery concerning a civil suit filed by several of the complainants. The crux of this contention is defendant's assertion that it was only well after the trial that he became aware of a pending civil lawsuit filed on behalf of five of the complainants. In support of this contention, defendant also argues that this lack of discovery prohibited relevant cross-examination of the minor complainants' biases and prejudices. The reasonableness of these assertions wilts under even a cursory examination of the record.

The State's eighth motion *in limine* requested that the trial court "deny defendant the ability to discuss the *pending civil lawsuits against [the Home]* by the next of friends of the victims in this cause." (Emphasis added.) On October 18, 1993, two days before the trial began, the trial court denied the motion. The court stated, "I think [defendant is] entitled to cross-examine into the issue of knowledge or discussions that [the complainants] have with attorneys dealing with the facts, who they've talked to about the case." On August 27, 1993, the trial court ordered the Home to turn over "[a]ttorney liens and [Home] legal correspondence." Defense counsel alleged the Home never provided such discovery. However, while the Home was obliged to comply with the order, its alleged failure to make discovery may not be imputed to the State. Indeed, there is no evidence or allegation that the Home's failure was the result of an agreement or conspiracy between it and the State.

The record supports the inference that defense counsel knew of the civil lawsuits before the trial began and had an opportunity to cross-examine the complainants on this issue. However, defendant goes further and asserts the State had a duty to provide him with discovery concerning the civil lawsuit. In support of this duty, defendant cites *People v. Redmond,* 146 Ill.App.3d 259, 99 Ill.Dec. 949, 496 N.E.2d 1041 (1986). In *Redmond* the State failed to reveal that its only identification witness had a prior criminal record. *Redmond,* 146 Ill.App.3d at 260, 99 Ill.Dec. 949, 496 N.E.2d 1041. The *Redmond* court held this failure violated the State's "continuing duty to disclose relevant criminal records of its witnesses against the accused." *Redmond,* 146 Ill.App.3d at 263, 99 Ill.Dec. 949, 496 N.E.2d 1041.

The present case is readily distinguishable from *Redmond* for at least two reasons. First, in *Redmond* the State was merely required to disclose the fact that its witness had a prior criminal record. In the present case, defendant would require the State to provide discovery concerning a cause it is not a party to. The result of defendant's position would vastly expand the scope of *Redmond;* the State would be required to conduct investigative work for a defendant whenever it could be alleged the fruits of such an investigation might yield evidence capable of impeaching a State witness. We do not believe such an extension is warranted. Second, the State in the present case may actually have given defendant notice of the civil lawsuit by way of the eighth motion *in limine.* In *Redmond,* by contrast, the State never disclosed its witness's prior convictions; defendant discovered the convictions after his sentencing hearing. Consequently, even if *Redmond* were to apply to the present case, the State has complied with its holding: it made defendant aware of the civil lawsuits.

Further, we note that the present case does not involve an informer who trades testimony for leniency. See, *e.g., People v. Gennardo,* 184 Ill.App.3d 287, 296, 304-05, 132 Ill.Dec. 90, 539 N.E.2d 400 (1989); *Gennardo,* 184 Ill.App.3d at 321, 132 Ill.Dec. 90, 539 N.E.2d 400 (Coccia, J., specially concurring). We reject the suggestion that a minor complainant in a criminal sexual abuse or assault trial-whose parents or next of friends have filed a civil action arising out of the same operative facts-has an interest that is perfectly analogous to that of either paid informants or parties who trade their testimony in one criminal cause for consideration by prosecuting authorities in a second cause. Admittedly, a minor complainant may have a pecuni-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

674 N.E.2d 454
285 Ill.App.3d 288, 674 N.E.2d 454, 220 Ill.Dec. 911
(Cite as: 285 Ill.App.3d 288, 674 N.E.2d 454)

ary interest in the outcome of a criminal trial because of the possible influence a guilty verdict might have on the civil cause. Such an interest would provide a proper basis for impeachment. However, the interest of the minor complainant and the criminal defendant testifying for the State are not fungible. Criminal defendants and particularly paid informants know or have a strong idea of the specific benefits that will be bestowed in exchange for their testimony; the benefit is contingent upon the testimony and there is a direct and unbroken relationship between the two. By contrast, any benefits a minor complainant may receive in a civil cause are highly attenuated from his or her testimony in the criminal trial. Thus, the possibility that the benefits shape or influence the minor complainant's testimony in the criminal matter is reduced.

In the present case, defendant was permitted to cross-examine the minor complainants about any communications between themselves and attorneys concerning the facts of the present case. Defense counsel asked three of the minor complainants if they had spoken with attorneys other than the State's Attorneys about the case. Two of the three complainants stated they had not spoken to other attorneys; a third testified he had discussed his move to Boy's Town in the State of Nebraska with an attorney named "Paul Krentz." In *Gennardo,* the defendant was not informed that a prosecution witness was a paid informant. Therefore, the defendant was prevented from cross-examining the State's witness on an actual pecuniary benefit the witness secured by virtue of his testimony. By contrast, defendant in the present case attempted and failed to show that the minor complainants knew a civil action had been filed on their behalf. Without such knowledge, the complainants could not have been biased on the basis of the possibility of pecuniary benefits arising from their testimony. Ultimately, as we have stated, the scope of cross-examination is entrusted to the discretion of the trial court. See, *e.g., Bridges,* 273 Ill.App.3d at 779-80, 210 Ill.Dec. 121, 652 N.E.2d 1097. In light of the foregoing, we do not believe defendant's citation of *Gennardo* controls the

present case.

Defendant argues that any failure of trial counsel in connection with the discovery of the civil action constituted ineffective assistance of counsel. We disagree. An assertion of ineffective assistance must be evaluated under the standards of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *Strickland* requires the defendant show (1) counsel was deficient; and (2) this deficiency prejudiced the defendant. *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693; *People v. McDaniel,* 164 Ill.2d 173, 187, 207 Ill.Dec. 304, 647 N.E.2d 266 (1995); *People v. Owens,* 269 Ill.App.3d 152, 159, 206 Ill.Dec. 478, 645 N.E.2d 483 (1994). A strong presumption exists that a defense counsel performed within the wide range of reasonable professional assistance (*People v. Mason,* 268 Ill.App.3d 249, 255-56, 205 Ill.Dec. 797, 644 N.E.2d 13 (1994); *People v. Zinnammon,* 266 Ill.App.3d 671, 677, 203 Ill.Dec. 477, 639 N.E.2d 1296 (1993)), and the evaluation of counsel's conduct does not extend to counsel's exercise of professional judgment, discretion, or tactics (*People v. Ramey,* 152 Ill.2d 41, 54, 178 Ill.Dec. 19, 604 N.E.2d 275 (1992)). We need not reach the second *Strickland* inquiry. Defense counsel could reasonably have decided that, in the eyes of the jurors, attempting to impeach the complainants by creating an inference their testimony was motivated by pecuniary gain would harm defendant more than it would help. Based on the nature of these crimes and the complainants' tender years, a competent attorney might conclude the benefit of such a tactic insufficient to justify the potential juror backlash. We find the failure to obtain discovery related to the civil lawsuit-and any resulting deficiency in the impeachment of the complainants on the basis of that lawsuit-was a valid tactical decision.

Defendant's fifth argument is that the trial court abused its discretion in imposing sentence. Again, we disagree. The Unified Code of Corrections (730 ILCS 5/1-1-1*et seq.* (West 1994)) permits a trial court to impose consecutive sentences if "the nature

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

674 N.E.2d 454

285 Ill.App.3d 288, 674 N.E.2d 454, 220 Ill.Dec. 911

**(Cite as: 285 Ill.App.3d 288, 674 N.E.2d 454)**

and circumstances of the offense and the history and character of the defendant" leads the court to believe consecutive sentences are "required to protect the public from further criminal conduct by the defendant" (730 ILCS 5/5-8-4(b) (West 1992) (now 730 ILCS Ann. 5/5-8-4(b) (Smith-Hurd Supp.1996)). A trial court possesses broad discretion in choosing a sentence because it is in the best position to weigh witness credibility and the evidence presented at the sentencing hearing. *People v. Jones*, 168 Ill.2d 367, 372-73, 213 Ill.Dec. 659, 659 N.E.2d 1306 (1995).

We hold the trial court did not abuse its discretion in imposing consecutive sentences. Defendant's father had been convicted of crimes similar to those for which defendant was found guilty. The trial court indicated a desire to put an end to the apparent generational passage of child-abuse pathology. Further, the court stated:

"I've seen * * * defendant. * * * And I would say his whole career at [the Home] was a system of manipulation and deception and taking advantage of people who looked to him for their support, looked to him for being their father figure.

I don't think it's necessary for everybody who has listened to this trial to go into details and I'm not going to go any further on that. There is a lot that can be said. I think the most that has to be said in fairness is in my sentence."

After reviewing the record, we find it abundantly clear the trial court believed consecutive sentences were necessary to protect children from further instances of sexual abuse and assault by defendant. See *People v. Carter*, 272 Ill.App.3d 809, 812-14, 209 Ill.Dec. 320, 651 N.E.2d 248 (1995) (relying on fact that defendant preyed on the most vulnerable members of society-the young-to support imposition of consecutive sentences).

Defendant's sixth contention is the trial court improperly imposed a sexual assault fine on defendant. The State confesses error on this point. Section 5-9-1.7 was not in effect when defendant commit-

ted the crimes for which he was convicted. Therefore, we vacate the sexual assault fine.

[The preceding material is nonpublishable under Supreme Court Rule 23].

For the foregoing reasons, the judgment of the circuit court of Kane County is affirmed in part and vacated in part.

Affirmed in part and vacated in part.

McLAREN, P.J., and RATHJE, J., concur.

Ill.App. 2 Dist.,1996.

People v. Wahl

285 Ill.App.3d 288, 674 N.E.2d 454, 220 Ill.Dec. 911

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

679 N.E.2d 385 (Table)                                                      Page 1
172 Ill.2d 565, 679 N.E.2d 385 (Table), 223 Ill.Dec. 200
**(Cite as: 172 Ill.2d 565, 679 N.E.2d 385 (Table))**

**H**

People v. Wahl
Ill. 1997.
(The decision of the Court is referenced in the
North Eastern Reporter in a table captioned
"Supreme Court of Illinois Dispositions of Petitions
for Leave to Appeal".)

Supreme Court of Illinois
People
v.
**Chad Wahl**
**NO. 82674**

MARCH TERM, 1997
Apr 02, 1997

Lower Court: 285 Ill.App.3d 288, 220 Ill.Dec. 911,
674 N.E.2d 454

Disposition: Denied.

Ill. 1997.
People v. Wahl
172 Ill.2d 565, 679 N.E.2d 385 (Table), 223
Ill.Dec. 200

END OF DOCUMENT

**EXHIBIT B**

IN THE SIXTEENTH JUDICIAL CIRCUIT
KANE COUNTY ILLINOIS

PEOPLE OF THE STATE OF ILLINOIS )
      PLAINTIFF, )
                        )
                        )    GEN. CASE NO. 92-CF-402
VS.                       )    REINDICTED GEN. NO.
                        )       93-CF-1401
                        )
CHAD E. WAHL, )
      DEFENDANT, )

## PETITION FOR POST CONVICTION RELIEF

     Now comes the Defendant, Chad E. Wahl, Pro Se, and moves
this Honorable Court pursuant to 725 ILCS 5/122 Et. Seq.,
entitled "Post Conviction Hearing". In support thereof the
Defendant avers the following:

1.    The Defendant is a resident of the Illinois Department of
      Corrections, the Big Muddy River Correctional Center, P.O.
      Box 900, Ina, Illinois, 62846.

2.    The Defendant hereby contends that his United State's
      Constitutional Rights as well as his Illinois Constitutional
      Rights were violated during the trial phase of these
      proceedings, to wit:

     a)   On March 6, 1992, the Defendant's private room, located
          on the Mooseheart International campus, was searched by
          a warrantless search and the Defendant's personal
          property was seized. the seized property included
          excupatory evidence which was subsequently misplaced
          and and still has not been found. (a violation of
          Defendant's fourth amendment right against search and
          seizure. (U.S. Const., Amend. IV)).

     b)   Defense Counsel Mark Fuller, was ineffective for not
          interviewing Abby Rogers and Greg Troop regarding there
          knowledge of the rapport shared by Chad Wahl and
          Officer Tom O'Donnell. (A violation of Defendant's
          sixth amendment right to effective assistance of
          counsel (U.S. Const., Amend. VI)).

     c)   The Trial Court violated the Defendant's right to due
          process (U.S. CONST., AMEND. XIV) when it allowed
          Officer Tom O'Donnell, Lynn Mirabella, and Laura
          Krystal to testify to hearsay and corroborate other
          other witnesses under 725 ILCS 5/115-10 entitled
          "CERTAIN HEARSAY EXCEPTION" when the children were over
          the age of fourteen (14).

EXHIBIT C      -00270

d)    The Defendant was not found guilty beyond a reasonable
      doubt, where the jury returned logically inconsistent
      verdicts, or in the alternative the Defendant was
      denied Due Process (U.S. CONST., AMEND. XIV) when the
      jury did not follow the judges instruction.

e)    Where guilt or innocence depends entirely on the
      credibility an accuser and the Defendant NO error
      should be permitted to intervene .

f)    The Trial Court violated the Defendant's right to Due
      Process (U.S. CONST., AMEND. XIV) when it relied upon
      improper evidence in imposing the sentence.

g)    The Defendant's Equal Protection (U.S. CONST., AMEND.
      XIV) was denied in that the record on appeal is
      incomplete in two (2) ways 1) There are questions
      without answers and the inverse; 2) There are whole
      volumes of the proceedings that are not available.

h)    Defendant was severely prejudiced when he had his bond
      revoked the same day that the state rested it's case in
      chief, and the Defense was to bring it's case the next
      working day.

i)    Joe Dingus a prosecution witness has subsequently been
      convicted of CHILD PORNOGRAPHY, Mr. Dingus additionally
      claims to suffer from Mental Illness. Both Mr. Dingus'
      conviction (his propensity toward this type of crime)
      and his MENTAL ILLNESS are facts that were unknown to
      the trier of facts and go the the credibility of his
      testimony.

j)    Defendant's Due Process (U.S. CONST., AMEND. XIV) WAS
      was violated where the prosecutor was giving witness
      Tom O'Donnell hand signals for answers to questions
      posed by the Defense.

3.    In further support of Defendant's Contention of "Bad Blood"
      between Officer Tom O'Donnell and the Defendant, the
      Defendant avers the following.

a)    Officer Tom O'Donnell contacted the Illinois State
      Department of Criminal Investigation, regarding the
      Defendant, Chad Wahl, making intimidating phone calls
      to the Defendant's victims, victims families, and the
      officer. .

b)    An officer from the Illinois State Police D.C.I. came
      to the Big Muddy River Correctional Center and
      interviewed the Defendant.

c)   The officer from the Illinois State Police D.C.I.
     determined from the interview of the Defendant that the
     Defendant could not have been making these calls due to
     the correctional center monitoring the phone calls and
     checking both incoming and outgoing mail for security
     reason.

d)   Officer O'Donnell then contacted the Big Muddy River
     Correctional Center's Internal Affairs Department and
     spoke to Lt. Flagg regarding the same allegations. Lt.
     Flagg, then interviewed the Defendant and determined
     that there was no merit in these allegations due to the
     Correctional Center monitoring the phone calls and the
     incomming and outgoing  mail being checked for security
     reasons.  (see exhibit 17)

e)   Thus the Defendant hereby contends that Officer
     O'Donnell is still harassing him even though he is
     incarcerated.

Wherefore the Defendant, Chad Wahl, prays that this
Honorable Court grants this Petition for Post Conviction Relief
and gives the Defendant a new trial.

Chad E. Wahl
P.O. Box 900 B-52827
Ina, Illinois, 62846

Signed before me this 17th day of January, 1997, by
Chad E. Wahl.

Notary Public

"OFFICIAL SEAL"
Carolyn Zee
Notary Public, State of Illinois
My Commission Expires 6/9/1997

NO. 2-94-0635

IN THE

APPELLATE COURT OF THE STATE OF ILLINOIS

SECOND JUDICIAL DISTRICT

| | |
|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, ) | Appeal from the Circuit Court |
| ) | for the 16th Judicial Circuit |
| Plaintiff-Appellee, ) | Kane County, Illinois. |
| ) | |
| -vs- ) | Nos. 92 CF 404, 93 CF 1410 |
| ) | |
| CHAD WAHL, ) | Honorable |
| ) | James Doyle, |
| Defendant-Appellant. ) | Judge Presiding. |

## MOTION FOR LEAVE TO FILE BRIEF IN EXCESS OF PAGE LIMITATION

Now comes Thomas A. Lilien, Assistant Defender, OFFICE OF THE STATE APPELLATE DEFENDER, Second Judicial District, counsel for the defendant-appellant, Chad Wahl, and moves this Honorable Court, pursuant to Supreme Court Rule 341(a), for leave to file a brief in excess of the 75-page limit.

IN SUPPORT OF THIS MOTION, counsel states the following:

1. The defendant was tried on a fourteen-count indictment involving nine separate complainants between October 18 and November 3, 1994. The jury convicted him of one count of aggravated criminal sexual assault, one count of attempt aggravated criminal sexual assault and six counts of aggravated criminal sexual abuse. The jury acquitted the defendant on the six other counts.

2. On January 21, 1994, the trial court imposed consecutive sentences totalling 41 years imprisonment upon the eight convic-

— EXHIBIT 1 —

tions. A timely-filed motion to reconsider the sentences was heard and denied on April 29, 1994.

3. A notice of appeal was timely filed on May 31, 1994. The Office of the State Appellate Defender was not appointed as appellate counsel until October 4, 1994, though.

4. This Honorable Court has now set September 29, 1995, as the final due date for the appellant's brief.

5. The record for the instant appeal is almost 3600 pages long. Counsel has read the record and is in the process of writing the brief. To date counsel has drafted a statement of facts that is 45 pages long. A lengthy statement of facts is necessary to give this Court a comprehensive view of the events at the trial and to adequately summarize the extensive testimony there; also, counsel is raising a suppression issue on which there was an evidentiary hearing below. Further, counsel has researched and drafted four issues for the brief so far. The draft of the issues covers 29 pages at this time. Counsel is thus at the 75-page limit for a brief at this point. Counsel believes that two additional issues with multiple subarguments should be raised. Counsel also has a few more shorter issues to research and potentially draft. With the requirement for such sections as Points and Authorities, the Nature of the Case and the Conclusion, counsel believes that he may need as many as 50 additional pages to adequately present the facts and issues to this Court.

6. Counsel has prepared the drafts of portions of the brief and will prepare the additional issues as concisely as reasonably possible, consonant with his professional duty to cite adequate

authority in support of the arguments, to provide a complete statement of facts and to zealously advocate for his client. <u>See</u>, Rule 341(e)(6) and (7); Code of Professional Responsibility Rule 7-101.

WHEREFORE, appellate counsel, on behalf of the defendant-appellant, respectfully moves this Honorable Court for leave to file an Appellant's Brief that does not exceed 125 pages in length.

Respectfully submitted,

Thomas A. Lilien, Assistant Defender
2010 Larkin Avenue
Elgin, Illinois 60123
(708) 695-8822
Counsel for Appellant

STATE OF ILLINOIS )
                  )  SS
COUNTY OF KANE    )

VERIFICATION

Thomas A. Lilien, Assistant Defender, OFFICE OF THE STATE APPELLATE DEFENDER, being first duly sworn, deposes and says that he has read the above and foregoing motion, knows the contents thereof, and that the matters and things therein stated are true.

Thomas A. Lilien, Assistant Defender

SUBSCRIBED and SWORN to
before me this 12th day
of September, 1995.

Notary Public



OFFICIAL SEAL
NORMA L. HUERTA
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 11-7-95

EXHIBIT 1B

C000275


SEP 2 2 1995

OFFICE OF THE STATE
APPELLATE DEFENDER
ELGIN, ILLINOIS

STATE OF ILLINOIS APPELLATE COURT SECOND DISTRICT

OFFICE OF THE CLERK
708/695-3750

APPELLATE COURT BUILDING
ELGIN, ILLINOIS
60120-8538

Appeal from the Circuit Court of County of Kane

　　　Trial Court No.: 93CF1410

THE COURT HAS THIS DAY, 09/20/95, ENTERED THE FOLLOWING ORDER IN
THE CASE OF:

　　　Gen. No.: 2-94-0635

　　　People v. Wahl, Chad

　　　　　Motion by appellant to file brief in excess of
　　　　　page limitations.  Motion allowed, and appellant's
　　　　　brief shall not exceed 125 pages in length.


　　　　　　　　　　　　　　LOREN J. STROTZ
　　　　　　　　　　　　　　Clerk


cc: G. Joseph Weller, Deputy Defender
　　✓Thomas A. Lilien
　　Honorable David R. Akemann
　　William L. Browers, Deputy Director

EXHIBIT 2

0000276

# A F F I D A V I T

I, ___CHAD WAHL_____, hereby state that the
following statement is true and correct, as sworn to under the
penalty of perjury, and do hereby state the following;

I was employed by Mooseheart International from the fall of
1991 through May 1992.

That during the time I was employed by Mooseheart
International, I was required to live on the Mooseheart Campus.

Mooseheart International required me to pay for my room and
board. Mooseheart international deducted $55.⁰⁰ out of every pay
check, for a total of $110.⁰⁰ per month. In exchange for said
room and board, I was issued a private room either on a nightly
basis (when I would be working as a relief houseparent) or on a
permanent basis (when I was assigned to a hall on a permanent
basis). END OF STATEMENT.

_____END OF STATEMENT.

I, ___CHAD WAHL_____, hereby state that the above
statement is true and correct, as sworn to, under the penalty of
perjury.

/S/ _Chad Wahl_____

~~Sworn and~~ subscribed to before me this _13th_ day of _January_.
199_7_, by _Chad Wahl_.

_Jennifer L Wilson_
Notary Public

OFFICIAL SEAL
JENNIFER L WILSON
NOTARY PUBLIC STATE OF ILLINOIS
MY COMMISSION EXP. NOV. 15,1999

EXHIBIT 3          C000277

# A F F I D A V I T

I, __CHAD WAHL__, hereby state that the following statement is true and correct, as sworn to under the penalty of perjury, and do hereby state the following;

I was employed at Mooseheart International on September 1, 1991, through March 5, 1992.

In October 1991, I was assigned to work as a permanent houseparent in New Jersey Hall, on the Mooseheart Campus.

As part of my job description, I was obligated to reside on the Mooseheart Campus. As such I was assigned the "Relief Houseparent Room" in New Jersey Hall, and was issued a set of keys.

Upon arriving to my assigned room, I found a room with two solid doors. Both doors had a dead bolt lock. Upon checking the keys I found a key that functioned each dead bolt lock.

Upon speaking to the other Houseparent, I found that Jane Bowen did not have a key that would operate the locks on my door.

I then felt that by personal property was safe from intrusions. __END OF STATEMENT.__

_____ END OF STATEMENT.

I, __CHAD WAHL__, hereby state that the above statement is true and correct, as sworn to, under the penalty of perjury.

/S/ _Chad Wahl_

Sworn and subscribed to before me this 13th day of January, 199_7_, by Chad Wahl.

_Jennifer L Wilson_
Notary Public

OFFICIAL SEAL
JENNIFER L WILSON
NOTARY PUBLIC STATE OF ILLINOIS
MY COMMISSION EXP. NOV. 15,1999

EXHIBIT 4   0000278

## A F F I D A V I T

I, CHAD WAHL , hereby state that the following statement is true and correct, as sworn to under the penalty of perjury, and do hereby state the following;

I worked at Mooseheart International from October 1, 1996 through March 5, 1992.

That during that time the Mooseheart campus was a closed campus. There is a guard on duty twenty-four (24) hours a day, seven (7) days a week positioned at the main entrance, with all other points of egress blocked by chained gates.

Additionally there are roving guards that patrol the perimeter. Also there is a two (2) foot retaining wall with a steep 60° graded ditch that is 8' wide and 10' deep. Thus it would not be possible to drive or walk on this campus without being observed. END OF STATEMENT

_____

_____

_____

_____

_____

_____

_____  END OF STATEMENT.

I, CHAD WAHL , hereby state that the above statement is true and correct, as sworn to, under the penalty of perjury.

/S/ Chad Wahl

Sworn and subscribed to before me this 13th day of January. 199 7, by Chad Wahl.

Jennifer L Wilson
Notary Public

OFFICIAL SEAL
JENNIFER L WILSON
NOTARY PUBLIC STATE OF ILLINOIS
MY COMMISSION EXP. NOV. 15,1999

— EXHIBIT 5 0000279 —

# A F F I D A V I T

I, ___CHAD WAHL_____, hereby state that the
following statement is true and correct, as sworn to under the
penalty of perjury, and do hereby state the following;

On March 5, 1992, I was arrested by Officer Tom O'Donnell on
the Mooseheart International campus.

I was transported to the Kane County Jail Facility on march
March 5, 1992, right after my arrest.

I remained in custody at the Jail Facility from March 5,
1992 until approximately March 19, 1992.  END OF
STATEMENT.

_____ END OF STATEMENT.

I, ___CHAD WAHL_____, hereby state that the above
statement is true and correct, as sworn to, under the penalty of
perjury.

/S/ _Chad Wahl_____

~~Sworn and~~ subscribed to before me this _13th_ day of _January_.
199_7_, by _Chad Wahl_.

_Jennifer Wilson_
Notary Public

OFFICIAL SEAL
JENNIFER L WILSON
NOTARY PUBLIC STATE OF ILLINOIS
MY COMMISSION EXP. NOV. 15,1999

6

EXHIBIT 6

C000280

1    be correct.

2        THE COURT:  I mean, if a complaint is filed, a

3    complaint is filed.  But if there is indications that have

4    been made to Mooseheart that they're going to file it, I

5    think that would be relevant.  You would agree with that?

6        MR. SOSNOWSKI:  I believe there is some relevancy to

7    that.

8        THE COURT:  That will be ordered.

9        MS. GRAHN:  Nothing in the children's files with

10   regard to that.

11       THE COURT:  Nothing in the children's files.  I

12   assume that will be the legal end of it, so that will be

13   granted on that issue.

14       MR. FULLER:  Judge, those are -- I'm looking for two

15   other things.  The personnel file on my client to see

16   if -- two other things in the subpoena.  A copy of his --

17       THE COURT:  Nobody objects to a copy of his personnel

18   file.  That certainly is relevant and so that is granted.

19       MR. FULLER:  Another request as to whether or not

20   Mooseheart, when he was arrested at the time if they were

21   in possession of any physical items that were taken from

22   his room or his private room where he lived.

23       THE COURT:  The State has a chance to respond if

24   there is anything they can review on that.

28

EXHIBIT 7

C000281

1    MR. SOSNOWSKI:  I would have a problem with that,

2  Judge, as far as releasing --

3        THE COURT:  Not going to release it, but he can view

4  it.

5        MR. SOSNOWSKI:  Right.

6        THE COURT:  If it's evidence and part of the State's

7  case.

8        MR. SOSNOWSKI:  There has been actually a piece of

9  evidence that was extracted from the defendant's residence

10  that has been disclosed and the availability to look at

11  that has already been afforded to defense counsel.

12        MS. TRACY:  Anything that the State would intend to

13  use would be in evidence with the Illinois State Police,

14  but I'm not aware of any items that remain at Mooseheart

15  that belong to the defendant.

16        THE COURT:  Okay, you guys can check on that.  Ms.

17  Grahn, I don't know what your schedule is like.  I keep

18  putting you on the spot.  If you have any problems, I want

19  to conduct an in camera inspection with you.  If you can

20  do it, I can probably do it today or this afternoon.

21        MS. GRAHN:  I have a 1:00 o'clock hearing before

22  Judge Eichmeier.  I don't think it will take too long.  I

23  think Mooseheart can leave the records with you.

24        THE COURT:  Okay.

EXHIBIT 7A          C000282

# A F F I D A V I T

I, ___CHAD WAHL___ , hereby state that the following statement is true and correct, as sworn to under the penalty of perjury, and do hereby state the following;

That I was employed at Mooseheart International at October 1, 1991, through March 5, 1992.

While there I was assigned the permanent houseparent position in New Jersey Hall.

While I was the permanent houseparent position, I was required to produce a "Daily Log Sheet" for all incidents that occurred that day, and submit them to my supervisor Joe Dingus.

I additionally kept a copy of my reports in a personal file, in my room (a room which I paid rent on) in the closet on the floor in a xerox box.

My personal file contained reports that I had wrote up on officer tom O'Donnell as well as disciplinary reports on the children.

I have not seen these files since my arrest.

END OF STATEMENT. -------------------------------------

END OF STATEMENT.

I, ___CHAD WAHL___ , hereby state that the above statement is true and correct, as sworn to, under the penalty of perjury.

/S/ _Chad Wahl_

Sworn and subscribed to before me this 13th day of January, 199 7, by Chad Wahl.

_Jennifer Wilson_
Notary Public

**OFFICIAL SEAL**
JENNIFER L WILSON
NOTARY PUBLIC STATE OF ILLINOIS
MY COMMISSION EXP. NOV. 15,1999

EXHIBIT 8       0000283

# A F F I D A V I T

I, CHAD WAHL _____, hereby state that the
following statement is true and correct, as sworn to under the
penalty of perjury, and do hereby state the following;

On or about March 13, 1992, I had my first consultation with
Counsel Mark Fuller, I informed him what Officer O'Donnell had
done and said during the interview of March 5, 1992.

I informed Mr. Fuller that there has been "Bad Blood"
between Officer O'Donnell and my self. That it started when
Officer O'Donnell approached me in front of West Virginia Hall,
and stated "Hey Chad, I can't seem to get through to these kids,
they are not opening up to me. How can I get them to open up to
me?" I responded by saying, "First thing you have to do is take
off your badge and gun, don't come on to them like a cop. Because
most of them don't trust cops, a lot of them have parents in
prison or were taken away by police. You have to make friends
with them." At that point he got angry with me and stomped off.

I then informed Mr. Fuller that other houseparents knew
about the hostility between me and office O'Donnell. I gave him
hte names of Greg Troop and Abby Rogers. ------------------------

END OF STATEMENT------------------------------------------

_____

_____ END OF STATEMENT.

I, CHAD WAHL _____, hereby state that the above
statement is true and correct, as sworn to, under the penalty of
perjury.

/S/ *Chad Wahl*

~~Sworn and~~ subscribed to before me this 13th day of January,
199 7, by Chad Wahl.

*Jennifer Wilson*
Notary Public

OFFICIAL SEAL
JENNIFER L WILSON
NOTARY PUBLIC STATE OF ILLINOIS
MY COMMISSION EXP. NOV. 15,1999

EXHIBIT 9    C000284

INTY OF ___Jefferson )

## A F F I D A V I T

I, Chad Wahl _____, hereby state that the
following statement is true and correct, as sworn to under the
penalty of perjury, and do hereby state the following;
I have attempted to locate Greg Troop so that I could acquire an
affidavit, to support my allegation contained within my Petition
for Post Conviction Petion. To Date I have been unsuccessful in
my efforts. This is due in large part to my incarceration and
lack of  physical access mutual contacts or other forms of
location devices such as phone books, friends, parents, ect.
## END  OF  STATEMENT.

END OF STATEMENT.

I, _____Chad Wahl_____, hereby state that the above
statement is true and correct, as sworn to, under the penalty of
perjury.

/S/ _Chad Wahl_____

Sworn and subscribed to before me this 17th day of January.
199 7.

_Carolyn Zee_
Notary Public

"OFFICIAL SEAL"
Carolyn Zee
Notary Public, State of Illinois
My Commission Expires 6/9/1997

EXHIBIT 10

0000285

## A F F I D A V I T

I, ___CHAD WAHL_____, hereby state that the following statement is true and correct, as sworn to under the penalty of perjury, and do hereby state the following;

To the best of recollection neither my attorney Mr. Fuller, nor myself, received any notice of any State's Witness intending to testify regarding me informing them that I had been molested as a child. I have never been "Molested" and I did not make such a statement to anyone.

### END OF STATEMENT

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____ END OF STATEMENT.

I, ___CHAD WAHL_____, hereby state that the above statement is true and correct, as sworn to, under the penalty of perjury.

/S/ _Chad Wahl_

Sworn and subscribed to before me this 17th day of January. 199 7 .

_Carolyn Zee_
Notary Public

> "OFFICIAL SEAL"
> Carolyn Zee
> Notary Public, State of Illinois
> My Commission Expires 6/9/1997

— EXHIBIT 11    C000286

## AFFIDAVIT OF FACTS

I, Harry o. Wahl do hereby state that the following statement
is true and correct.

At some time prior to 1986, I purchased and acquired a number
of books, journals and related research materials for research
on my criminal case as well as that of several other persons.
One of the books purchased by me was titled "Paedophilia" and au-
thored by Tim O'Hara. My name was placed inside the cover to identify
the book as my property. [WAHL written or printed]. I also under-
line and add notations to the margins while researching in books
that are my personal property, place paper strip bookmarks in
areas for quick reference.

The above entitled book along with numerous others were sent
periodically to my X-wife Rita Wahl at her home for safe storage
as I completed the research on my criminal case. She resides in
Pekin, Illinois.

I further state that I have never PHYSICALLY, MENTALLY, EMOTION-
ally, OR SEXUALLY ABUSED my son Chad Erik Wahl, or any other child
purposely.

*Harry O. Wahl*
1-10-97

bscribed and sworn to before me

the 10th day of January, 1997.

*W.B. Webster*
Notary Public

My commission expires: 8-23-98

EXHIBIT 12    C000287

UNTY OF Jefferson )

ALE OF ILLINOIS )

## A F F I D A V I T

I, **CHAD WAHL**, hereby state that the following statement is true and correct, as sworn to under the penalty of perjury, and do hereby state the following;

On October 29, 1993, My bond was revoked by the Honorable Judge Doyle. The Date October 29, 1993, was significant in that the State had just rested it's case in chief. The Defense was to begin it's case in chief the next working day (Monday November 1, 1996).

Due to my Bond being revoked I was left to depend on other people to take care of things that I intended to take care of my self. Some of these things were were done improperly, or not as well as I would have done due to my having more experience and personal knowledge. Other things did not get done at all.

END OF STATEMENT.

I, **CHAD WAHL**, hereby state that the above statement is true and correct, as sworn to, under the penalty of perjury.

/S/ _Chad Wahl_

Sworn and subscribed to before me this 17th day of January, 1997.

_Carolyn Zee_
Notary Public

> "OFFICIAL SEAL"
> Carolyn Zee
> Notary Public, State of Illinois
> My Commission Expires 6/9/1997

EXHIBIT 13    0000288

*THE COURIER LINCOLN ILLINOIS*

FRIDAY, OCTOBER 11, 1996

# House parent pleads guilty to porn charges

By MATT BARON
COPLEY NEWS SERVICE

ST. CHARLES — Face-to-face, the two former police officers carried on a dialogue Thursday in a felony courtroom of the Kane County Judicial Center.

One, 16th Circuit Court Judge James Doyle, was dressed in a black robe. The other, Joseph Paul Dinges, appeared in an orange jail uniform.

Dinges was there to plead guilty to three counts of child pornography, stemming from actions that occurred while he was a live-in house parent at Mooseheart between May and September 1995.

In exchange, prosecutors dropped two other counts of child pornography and two counts of aggravated criminal sexual abuse.

As Doyle methodically related told Dinges he was suspended Dinges' rights, the defendant kept his remarks to a minimum.

"Yes, your honor," he said repeatedly in response to Doyle's questioning. If he was aware of his guilty plea's implications.

The agreement is a "cold" plea, which means the terms of the sentence are not part of the arrangement.

Doyle could sentence Dinges on five counts of child pornography and two counts of aggravated criminal sexual abuse.

For nearly six months, Dinges has remained in the county jail. He has been under extra surveillance, based on suicidal statements he expects to make while being arrested.

Through Walthius, Dinges has maintained that he did not molest any youths.

That contention was formalized Thursday, as prosecutors agreed to dismiss charges that he fondled two male students and solicited a student to masturbate on film or videotape.

As for the three counts of child pornography, that he pleaded guilty to, state's attorney Debbie Simpson said the chain of events began in May 1995.

Dinges "made arrangements to look the 'other way' when the teen-age girls would, in violation of Mooseheart rules, enter the hall where Dinges was a house parent."

Former students have told The (Elgin) Courier-News the girls would then have sexual relations with boys inside their rooms. On

the case, Dinges' attorney, Scott Walthius, said he expects sentencing to occur in early 1997.

The 40-year-old, who will remain in the Kane County Jail in the meantime, also faces a minimum $3,000 fine, said Patricia Piper Golden, director of the Child Advocacy Center, a branch of the state's attorney's office that prosecuted Dinges.

In less than a year, the former Rock Falls police officer has taken an enormous tumble.

Last Halloween night, a Kane County Sheriff's deputy escorted him — in handcuffs and in tears — from the 1,200-acre campus.

Mooseheart officials had just told Dinges he was suspended and could not return to his living quarters until an internal review was completed into possible misconduct charges.

He was fired within several days, severing a 10-year employment there.

In April, after a six-month investigation, a grand jury indicted

Dinges on the activity, and did nothing to inhibit it.

According to Simpson, Dinges then said to one 17-year-old boy living in the hall, "Now that you've been doing this, you have to do something for me."

Dinges arranged for that individual and another 17-year-old boy under his supervision, to videotape at separate times their sexual relations with the unwitting females.

Dinges planted a video camera in the closet, viewed the footage and later showed it to the boys, Simpson said.

Walthius said Dinges told him he destroyed both tapes.

Outside court, Golden and Walthius both indicated satisfaction with the agreement.

"We feel he pleaded guilty to the most serious offenses," Golden said.

Dinges' next court date is Nov. 22. Meanwhile, in addition to the standard pre-sentencing report, he will undergo an evaluation at the Kane County Diagnostic Center.

EXHIBIT 14

C000289

# Ex-worker pleads guilty in sex case

**By Linda Young**
TRIBUNE STAFF WRITER

Answering a judge's questions with a polite "Yes, your honor," a former Mooseheart houseparent admitted Thursday he videotaped children as they engaged in various sexual acts at the residential center near Batavia.

Joseph Paul Dinges, 40, pleaded guilty to three counts of child pornography during a court hearing before Kane County Judge James T. Doyle. Each charge carries a maximum 15-year prison sentence and a mandatory $1,000 fine.

As part of a plea agreement, prosecutors dropped three other charges, including two counts of sexual abuse.

Assistant State's Atty. Debbie Simpson laid out the case against Dinges, saying that the former houseparent sought cooperation from teenagers to videotape minors' sexual behavior during a five-month period last year. Some of the victims were not aware of the camera, Simpson said.

At least two tapes were made, but apparently were destroyed and have not been seen by authorities.

The judge could rule Dinges eligible for probation, but according to Patricia Golden, director of Kane County's Child Advocacy Center, prosecutors will seek at least some prison time for the former police officer.

"He pleaded guilty to the most serious of the offenses," Golden said. "We believe we've correctly represented what happened."

But Dinges' attorney, Scott Walthius, argues his client is mentally ill.

Dinges, who worked at Mooseheart for about 10 years before he was fired last November, has received some psychological evaluation in Kane County Jail since his April arrest and has been given anti-depressant medication.

But Dinges has not been formally diagnosed with any form of mental illness. Walthius said he believes further evaluation will result in a diagnosis of a mental disorder.

Those evaluations will be reviewed during a Nov. 22 status hearing in Doyle's courtroom. No sentencing date was set.

EXHIBIT 15

0000290

# A F F I D A V I T

I, __CHAD WAHL_____, hereby state that the following statement is true and correct, as sworn to under the penalty of perjury, and do hereby state the following:

On October 29, 1993, while at the Defense Table at the Kane County Courthouse, during the time that Officer Tom O'Donnell was testifying, I observed State's Attorney Drew (last name unknown) give Officer O'Donnell signals on how to answer the questions being asked.

I then informed my attorney Mark Fuller, regarding the use of signals and after observing the State's Attorney he agreed with me.

At break Mr. Fuller inquired of the State's Attorney "Play baseball lately"? The State's Attorney denied giving signals.

END OF STATEMENT---------------------------------

_____END OF STATEMENT.

I, __CHAD WAHL_____, hereby state that the above statement is true and correct, as sworn to, under the penalty of perjury.

/S/ _Chad Wahl_

~~Sworn and~~ subscribed to before me this _13th_ day of _January_ 199_7_, by _Chad Wahl_.

_Jennifer L Wilson_
Notary Public

OFFICIAL SEAL
JENNIFER L WILSON
NOTARY PUBLIC STATE OF ILLINOIS
MY COMMISSION EXP. NOV. 15,1999

EXHIBIT 16          C000291

# A F F I D A V I T

I, ___CHAD WAHL_____, hereby state that the following statement is true and correct, as sworn to under the penalty of perjury, and do hereby state the following:

I have attempted to contact Mark Fuller, my trial attorney, regarding his recollection of the prosecutor giving hand signals to Officer Tom O'Donnell and providing an affidavit to that effect. However, I have not been able to make contact and speak with him, nor has he answered any of my inquires. Thus I have not been able to obtain an affidavit from him.  END  OF STATEMENT------------------------------------------------

_____END OF STATEMENT.

I, ___CHAD WAHL_____, hereby state that the above statement is true and correct, as sworn to, under the penalty of perjury.

/S/ _Chad Wahl_____

Sworn and subscribed to before me this _13th_ day of _January_ 199_7_, by _Chad Wahl_.

_Jennifer L Wilson_____
Notary Public

OFFICIAL SEAL
JENNIFER L WILSON
NOTARY PUBLIC STATE OF ILLINOIS
MY COMMISSION EXP. NOV. 15,1999

EXHIBIT 16A    C000292

STATE OF ILLINOIS )
)
COUNTY OF JEFFERSON )

## AFFIDAVIT STATEMENT

I, _Chad Wahl_ , hereby state that the foregoing
statement is true and correct, as sworn to under the penalty
of perjury, and do hereby state the following;

On May 16, 1996 at or about 9:45 a.m., while
The Big Muddy River Correctional Center was on
Lock down status, An unknown officer came
to my assigned Cell (Unit R1 D wing Cell 73) And
informed me That The warden wanted to talk to me.
I was then escorted to the Clinical Services
Building + Then to The internal Affairs office.
Upon entering The office I observed Liestenant
Flass (Badge no. unknown) And warden Jack T. Hartwig
I was ordered to Sit down, where upon
Sitting I was Read my "Maranda Rights". I
Promptly Requested An Attorney + plead The 5th
Amendment Right against Self-incrimination. The
Authorities Continued To Question me Regarding
An alledged Harassment of An unspecified Police
Officer, His wife And my alledged victims.

END OF STATEMENT.

I, _Chad Wahl_ , hereby state that the above
statement is true and correct, as sworn to, under the penalty
of perjury.

/S/ _Chad E. Wahl_

Sworn and subscribed before me,
this _16th_ day of _May_ 19 _96_

_[signature]_
NOTARY PUBLIC

OFFICIAL SEAL
JENNIFER L WILSON

0000293

# A F F I D A V I T

I, __RITA WAHL_____, hereby state that the following statement is true and correct, as sworn to under the penalty of perjury, and do hereby state the following;

On April 2, 1992, was my son, Chad Wahl's, Arraignment Hearing. While waiting for Attorney Mark Fuller, in the lobby of the courthouse, Officer Tom O'Donnell approached my son (Chad) and asked if he (Chad) received a letter from D.C.F.S.. Chad said "I don't know" and I told Officer O'Donnell that he will have to ask our lawyers. Officer O'Donnell made an exasperated sound and shook his fists at me, then proceeded to walk away. A few moments later he (Officer O'Donnell) came back and asked if our lawyer was going to be there. I informed him that Mr. Fuller was to be expected. **END OF STATEMENT**- - - - - - - - - - -

_____ END OF STATEMENT.

I, ___RITA WAHL_____, hereby state that the above statement is true and correct, as sworn to, under the penalty of perjury.

/S/ _Rita Wahl_____

Sworn and subscribed to before me this _20_ day of _January_.
199 _7_ .

_Sharlene J. Homerin_____
Notary Public

```
OFFICIAL SEAL
SHARLENE J HOMERIN
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES:03/27/97
```

EXHIBIT 17        0000294

# A F F I D A V I T

I, __RITA WAHL_____, hereby state that the
following statement is true and correct, as sworn to under the
penalty of perjury, and do hereby state the following;

Sometime between Christmas and New Years 1991, I went to the
Mooseheart International Campus, to vist my son Chad Wahl, and
take him out to eat.

Jessie Croff, Shawn Wilson, and two other boys were arround
around Chad when I arrived. Shawn was turning Chad's collar the
way it would look "groovy". All four boys gave chad the "Hi-Five"
when he was ready to leave.

When we returned, Jesse showed me his Baseball Cards. Shawn
showed me some of his collection also. A few of the boys were
watching T.V.. All of the boys were friendly and outgoing with
Chad and me. Not one of them acted scared or frightful towards
Chad while I was there or any other time I visited the Mooseheart
International Campus to visit with Chad.

END OF STATEMENT - - - - - - - - - - - - - - -

_____

_____

_____

_____

_____

_____ END OF STATEMENT.

I, __RITA WAHL_____, hereby state that the above
statement is true and correct, as sworn to, under the penalty of
perjury.

/S/ _Rita Wahl_____

Sworn and subscribed to before me this _20_ day of _January_.
199_7_.

_Sharlene J. Homerin_
Notary Public

OFFICIAL SEAL
SHARLENE J HOMERIN
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES:03/27/97

TY OF _____

# A F F I D A V I T

I, ___RITA WAHL_____, hereby state that the
following statement is true and correct, as sworn to under the
penalty of perjury, and do hereby state the following;

On Monday November 1, 1992, was the first day the Defense
put on their case.

Greg Troop was sitting on a bench in the hallway outside the
courtroom. Assistant State's Attorney Drew Sasnowski walked up to
Greg Troop and asked who he was and if he was planning to
testify. I immediately walked over and told Drew that if he had
any questions, he should ask Mark Fuller. Drew left and then
Officer Tom O'Donnell walked up to Greg and asked who he was.
Greg told Officer O'Donnell he wasn't suppose to talk to anyone.

Officer O'Donnell then walked over to Greg's brother, Doug
Troop, showed his badge, introduced himself as a police
investigator, and asked if Doug would reveal his name. Doug said
that he was not at liberty to tell the officer.

Moments later, Doug's wife walked to the end of the hall
near the elevator's to get a drink of water when Officer
O'Donnell approached her for her name. She refused his request.

_____END OF STATEMENT.

I, ___RITA WAHL_____, hereby state that the above
statement is true and correct, as sworn to, under the penalty of
perjury.

/S/ _Rita Wahl_
DLR

Sworn and subscribed to before me this _20_ day of _January_,
199_7_.

_Sharlene J. Homerin_
Notary Public

OFFICIAL SEAL
SHARLENE J HOMERIN
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 03/27/97

# IN THE CIRCUIT COURT FOR THE SIXTEENTH JUDICIAL CIRCUIT
## KANE COUNTY, ILLINOIS

GEN. NO. 92 CF 404; 93 CF 1410

☐ JURY   ☐ NON-JURY

*[Filed stamp: Clerk of Circuit Court, Kane County, IL, MAY 20 1999, FILED, ENTERED]*

People                    VS.   Chad Wade

**PLAINTIFF (S)**                    **DEFENDANT (S)**

| JUDGE Doyle | COURT REPORTER Grady | PLTF. ATTY. Tracy | ✓ |
|---|---|---|---|
| DEPUTY CLERK | A copy of this order ☐ should be sent to: ☐ has been sent to: | DEFT. ATTY. Carone | ✓ |

CHECK IF PRESENT

## ORDER 1/2

This matter coming before the Court for hearing on ^States Motion to Dismiss Defendant's Amended Petition for Post-Conviction Relief, and the Court having heard arguments of Counsel:

1) re: Paragraphs 35-56; all of which concern admissibility of 115-10 statements, the State's Motion to Dismiss is granted, subject to further review of the record by defense.

2) Regarding paragraphs 6-26, the State's Motion to Dismiss is granted.

3) Regarding paragraphs 27-34, the State's Motion to Dismiss is granted.

4) Regarding paragraphs 57-68, the State's Motion to Dismiss is granted.

DATE 5/20/99

JUDGE

Yes ☐   No ☐   Disposal

000051

P7-MISC-001

# IN THE CIRCUIT COURT FOR THE SIXTEENTH JUDICIAL CIRCUIT
## KANE COUNTY, ILLINOIS

GEN. NO. 92 CF 404, 93CF 1460

☐ JURY   ☐ NON-JURY

People    VS.    Chad Wahl

**PLAINTIFF (S)**      **DEFENDANT (S)**

| JUDGE Doyle | COURT REPORTER Grady | PLTF. ATTY. Tracy | ✓ |
|---|---|---|---|
| DEPUTY CLERK | A copy of this order ☐ should be sent to: ☐ has been sent to: | DEFT. ATTY. Carone | ✓ |

CHECK IF PRESENT

**ORDER** 2/2

5) Regarding paragraphs 69 — 86 of, the States Motion is granted.

6) Regarding paragraphs. 87-101, the States Motion is granted.

DATE 5/20/99

JUDGE

Yes ☐ 000051 2 Disposal

P7-MISC-001

No. 2--99--1370

MAR 05 2001

LOREN J. STROTZ, CLERK
APPELLATE COURT 2nd DISTRICT

This Order was Filed Under
And is Not To Be Cited

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Nos. 92--CF--404 93--CF--1410 |
| CHAD E. WAHL, | ) ) | Honorable |
| Defendant-Appellant. | ) ) | James T. Doyle, Judge, Presiding. |

## RULE 23 ORDER

Following a jury trial, defendant, Chad E. Wahl, was convicted of six counts of aggravated criminal sexual abuse (720 ILCS 5/12--16(C)(1)(i) (West 1992)), one count of aggravated criminal sexual assault (720 ILCS 5/12--14(b)(1) (West 1992)), and one count of attempted aggravated criminal sexual assault (720 ILCS 5/8--4(a), 12--14(b)(1) (West 1992)). Defendant was acquitted of three counts each of aggravated criminal sexual assault and aggravated criminal sexual abuse. The charges against defendant stemmed from incidents of sexual abuse at a home for dependent children where defendant was employed as a houseparent. The trial court imposed consecutive sentences of 4 years' imprisonment for each aggravated criminal sexual abuse conviction, 10 years' imprisonment for the aggravated criminal sexual assault conviction, and 7 years' imprisonment for the attempted aggravated criminal sexual assault conviction. On direct appeal, this court affirmed defendant's convictions and

sentences and vacated a $100 fine. See People v. Wahl, 285 Ill. App. 3d 288 (1996).

In August 1998 defendant filed an amended postconviction petition (see 725 ILCS 5/122--1 (West 1998)). In December 1998 the State filed a motion to dismiss, arguing that the issues raised in defendant's postconviction petition were barred from review based on the doctrines of res judicata and waiver. In May 1999 the trial court conducted a hearing on the State's motion. In his petition, defendant alleged, inter alia, that the trial court erroneously admitted the hearsay testimony of certain witnesses concerning statements made by complainants who were over the age of 13. However, at the hearing, the State informed the trial court that one of the witnesses did not testify, and the testimony of the other two witnesses was limited. The record also reflected that the complaining witnesses themselves testified at trial. Defense counsel agreed that the objected-to statements were not admitted. We note that counsel has not pursued this issue on appeal. Following the arguments of the parties as to the remainder of the allegations, the trial court dismissed defendant's petition. In October 1999 the trial court denied defendant's motion to reconsider, and defendant timely appeals. We affirm.

A proceeding brought under the Post-Conviction Hearing Act (the Act) (725 ILCS 5/122--1 et seq. (West 1998)) is not an appeal of a defendant's underlying judgment but rather a collateral attack on the judgment. People v. King, 192 Ill. 2d 189, 192 (2000). The petitioner in a postconviction hearing is not entitled to an evidentiary hearing as of right. People v. Hobley, 182 Ill. 2d

No. 2--99--1370

404, 427-28 (1998). To be entitled to postconviction relief, the petitioner bears the burden of establishing a substantial deprivation of federal or state constitutional rights. King, 192 Ill. 2d at 192. The purpose of the proceeding is to resolve allegations that constitutional violations occurred at trial, when those allegations have not been, and could not have been, adjudicated previously. King, 192 Ill. 2d at 192-93. Determinations of the reviewing court of the prior direct appeal are res judicata as to issues actually decided; issues that could have been presented on direct appeal, but were not, are deemed waived. Hobley, 182 Ill. 2d at 428. Our standard of review of a trial court's dismissal of a postconviction petition without an evidentiary hearing is de novo. People v. Fair, 193 Ill. 2d 256, 260 (2000), citing People v. Coleman, 183 Ill. 2d 366, 387-89 (1988).

On appeal, defendant contends that he was denied his constitutional rights at trial due to issues concerning his custodial interrogation, the trial testimony of a State's witness, the effective assistance of counsel, and sentencing. This court considered and subsequently rejected these substantially similar claims on direct appeal. See Wahl, 285 Ill. App. 3d 288. Defendant is now rephrasing his claims from his direct appeal. A petitioner cannot obtain relief under the Act by rephrasing, in constitutional terms, issues that were previously addressed, such as ineffective assistance of counsel. People v. Flores, 153 Ill. 2d 264, 277-78 (1992) (and cases cited therein). Defendant's claims, therefore, are barred by the doctrine of res judicata.

-3-

Defendant argues in his brief that, "due to the seriousness of the constitutional violations alleged in his petition, fundamental fairness requires a relaxation of the *** procedural bars." We note that the procedural bars of res judicata and waiver may be relaxed, inter alia, when fundamental fairness requires. Coleman, 183 Ill. 2d at 522. However, defendant fails to provide argument or facts sufficient to support our consideration of issues otherwise barred. Moreover, defendant failed to address the cause and prejudice requirements of the fundamental fairness exception. See People v. Franklin, 167 Ill. 2d 1, 15 (1995); see also People v. Hayes, 279 Ill. App. 3d 575 (1996). Defendant failed to cite any factors that impeded his counsel's efforts to raise the foregoing claims on direct review or cite to any errors that infected the entire trial to such an extent that his conviction violated due process. See Franklin, 167 Ill. 2d at 20. We find no reason based on fundamental fairness to suggest why the doctrine of res judicata should not apply to defendant's claims. Accordingly, the trial court properly dismissed defendant's postconviction petition.

The judgment of the circuit court of Kane County is affirmed. Affirmed.

HUTCHINSON, P.J., with GEIGER and BOWMAN, JJ., concurring.

Westlaw.

755 N.E.2d 482 (Table)                                                    Page 1
195 Ill.2d 595, 755 N.E.2d 482 (Table), 258 Ill.Dec. 99
**(Cite as: 195 Ill.2d 595, 755 N.E.2d 482 (Table))**

People v. Wahl
Ill. 2001.
(The decision of the Court is referenced in the
North Eastern Reporter in a table captioned
"Supreme Court of Illinois Dispositions of Petitions
for Leave to Appeal".)
                Supreme Court of Illinois
                        People
                          v.
                  **Chad E. Wahl**
                    **NO. 91490**

                  JUNE TERM, 2001
                   June 29, 2001

Lower Court: No. 2-99-1370

Disposition: Denied.

Ill. 2001.
People v. Wahl
195  Ill.2d  595,  755  N.E.2d  482  (Table),  258
Ill.Dec. 99

END OF DOCUMENT

EXHIBIT E

**IN THE CIRCUIT OF THE SIXTEENTH JUDICIAL CIRCUIT**
**KANE COUNTY, ILLINOIS**

PEOPLE OF THE STATE OF ILLINOIS   )
                         )
         vs.          )   No.   93-CF-1410
                         )
CHAD WAHL                 )
      Defendant - Petitioner   )

Clerk of the Circuit Court
Kane County, IL

OCT 1 4 2003

FILED _____
ENTERED _____

### SECOND AMENDED PETITION FOR POST-CONVICTION RELIEF
### UNDER 725 ILCS 5/122-1 *et seq.*

NOW COMES THE DEFENDANT, Chad Wahl, by and through his attorney, Jason Vincent, and petitions this Honorable court for post-trial relief pursuant to 725 ILCS 5/122-1 *et seq.*, the Post-Conviction Hearing Act, and in support thereof states the following:

### A. Introduction

1.     This is an amendment of petitioner's *pro se* Petition for Post-Conviction Relief filed on September 24, 1999. Petitioner seeks relief from denial of his Due Process rights under the 5th and 14th Amendments to the United States Constitution and Article 1, Section 2 of the Illinois Constitution. Specifically, the issue presented before this Honorable Court is whether the Court's original jurisdiction was lacking where the circumstances alleged under Count 13 of the indictment did not constitute the offense for which the petitioner was convicted.

### B. Procedural History

2.     On November 3, 1993 a jury found the Petitioner, Chad E. Wahl, guilty of six counts of aggravated criminal sexual abuse, one count of aggravated criminal sexual assault, and one count of attempted aggravated criminal sexual assault.

3.     On January 21, 1994 the Trial Court imposed consecutive sentences of four years for each of the abuse convictions, ten years for the assault conviction, and seven years for the attempt conviction. A Motion to Reconsider the sentences was heard and denied on April 29, 1994.

4.     The Petitioner timely appealed to the Appellate Court for the Second District. On December 12, 1996 the Appellate Court affirmed the Petitioner's convictions and sentences, but vacated a $100.00 fine. The Petitioner filed a petition for rehearing which

C001151

was denied on January 14, 1997.

5.      On January 16, 1997 the Petitioner timely filed notice of his intention to file a Petition for Leave to Appeal to the Supreme Court of Illinois. On April 2, 1997, the Supreme Court denied Petitioner's Petition for Leave to Appeal.

6.      On January 21, 1997 the Petitioner filed a *pro se* Post -Conviction Appeal. On August 25, 1998, the Petitioner filed an Amended Post-Conviction Appeal.

7.      On December 9, 1998 the State filed a motion to dismiss the Petitioner's Amended Post-Conviction Appeal.

8.      On May 20, 1999 the State's motion to dismiss Petitioner's Amended Post-Conviction Appeal was granted.

9.      On June 17, 1999 the Petitioner filed a Motion to Reconsider Dismissal of Amended Post-Conviction Petitioner.

10.     On September 24, 1999 Petitioner field a second *pro se* Post-Conviction Petition.

11.     On October 29, 1999 Petitioner's Motion to Reconsider Dismissal of Amended Post-Conviction petition was dismissed.

12.     On November 24, 1999 Petitioner filed notice of Post-Conviction Appeal to the Second District Appellate Court.

13.     On April 21, 2000 Petitioner filed his Post-Conviction Appeal with the Second District Appellate Court.

14.     On March 5, 2001 the Second District Appellate Court denied Petitioner's Post-Conviction Appeal.

15.     On March 13, 2001 Petitioner's Motion for Rehearing in the Second District Appellate Court was denied.

16.     On April 26, 2001 Petitioner filed a *pro se* Petition for Leave to Appeal to the Illinois Supreme Court.

17.     On June 29, 2001 Petitioner's Petition for Leave to Appeal to the Illinois Supreme Court was denied.

18.     On July 23, 2001 mandate of the Illinois Supreme court issued to the Second District Appellate Court.

19.     The Circuit Clerk of Kane County failed to docket Petitioner's September 24, 1999 *pro se* Post-Conviction Petitioner for consideration by the Court.

## C.  Statement of Facts

20.    Count 13 of the Petitioner's multiple count indictment alleges that the Petitioner committed the offense of aggravated criminal sexual assault in violation of Chapter 38, Section 12-14(b)(1) of the Illinois Revised Statues.  (*See* "Exhibit A," attached hereto and incorporated by reference.)

21.    Specifically, Count 13 alleged that the Petitioner, "who was 17 years of age or older, intentionally committed an act of sexual penetration with Jesse Croff, who was under 13 years of age when the act was committed, in that said Defendant placed his finger on the anus of Jesse Croff."

22.    The then relevant title and citation for aggravated criminal sexual assault at Chapter 38, Section 12-14 (b)(1) of the Illinois Revised Statutes states that, "The accused commits aggravated criminal sexual assault if:  the accused was 17 years of age or over and commits an act of sexual penetration with a victim who was under 13 years of age when the act was committed." (*See* "Exhibit B," attached hereto and incorporated by reference.)

23.    Thus, the circumstance alleged under the indictment at Count 13 that, "the defendant placed his finger on the anus of Jesse Croff" did not constitute the offense as it was defined in the statue since, "an act of sexual penetration" was required according to Chapter 38, Section 12-14 (b)(1) of the Illinois Revised Statutes

24.    For this reason, Petitioner's conviction for aggravated criminal sexual assault exceeded the Court's statutory authority in a criminal case.


## D.  Constitutional Violations

25.    When a conviction exceeds the statutory authority which determines the subject matter jurisdiction in a criminal case there can be no doubt that jurisdiction is lacking.  Where a conviction has taken place as a result of a process where the court lacked jurisdiction, that process cannot be said to be the *Due Process* of the 5th and 14th Amendments to the United States Constitution or Article 1, Section 2 of the Illinois Constitution.

WHEREFORE Petitioner respectfully requests this Honorable Court to:

A.    Order a hearing pursuant to the Post-Conviction Act, 725 ILCS 5/122-1 *et seq.* and determine that in the proceeding that resulted in his conviction there was a substantial denial of the Defendant's rights under the Constitutions of the United States and the State of Illinois;

B.    Enter an order vacating the Defendant's conviction of Count 13, aggravated criminal sexual assault;

C.    Grant such other and further relief as this Honorable Court deems fit and proper.

Respectfully submitted,
Chad Wahl


By: _____
Jason Vincent, his attorney


Jason Vincent
Capps Law Firm
Milwood Executive Suites
3200 Fishback Road
Carbondale, IL 62901
(618) 529-0956

Multiple Count Indictment

Indictment: PEOPLE V. ___CHAD E. WAHL_____, Pg.__13__

General Number: ___93 CF 1410___

THE GRAND JURY CHARGES THAT:

## Count Thirteen

On or about ___JUNE OF 1991 THROUGH MARCH 5, 1992___

___CHAD E. WAHL___

committed the offense of __AGGRAVATED CRIMINAL SEXUAL ASSAULT__

___CLASS X FELONY___

in violation of Chapter __38__, Section __12-14(b)(1)__ of the
Illinois Revised Statutes, as amended, in that
said defendant, who was 17 years of age or older, intentionally
committed an act of sexual penetration with Jesse Croff, who was
under 13 years of age when the act was committed, in that said
defendant placed his finger on the anus of Jesse Croff.

All of the foregoing occurred in Kane County, Illinois.

Exhibit A

0001155

(2) when the accused has overcome the victim by use of superior strength or size, physical restraint or physical confinement.

(e) "Sexual conduct" means any intentional or knowing touching or fondling by the victim or the accused, either directly or through clothing, of the sex organs, anus or breast of the victim or the accused, or any part of the body of a child under 13 years of age, for the purpose of sexual gratification or arousal of the victim or the accused.

(f) "Sexual penetration" means any contact, however slight, between the sex organ of one person and the sex organ, mouth or anus of another person, or any intrusion, however slight, of any part of the body of one person or of any animal or object into the sex organ or anus of another person, including but not limited to cunnilingus, fellatio or anal penetration. Evidence of emission of semen is not required to prove sexual penetration.

(g) "Victim" means a person alleging to have been subjected to an offense prohibited by Sections 12-13, 12-14, 12-15 or 12-16 of this Code.

Laws 1961, p. 1983, § 12-12, added by P.A. 83-1067, § 1, eff. July 1, 1984. Amended by P.A. 83-1117, § 1, eff. July 1, 1984.

Formerly Ill.Rev.Stat.1991, ch. 38, ¶ 12-12.

  ¹ 720 ILCS 5/5-1 et seq.

Section 27 of P.A. 83-1067, provided:

"Saving clause, construction. The abolition of any offense by this Act does not affect any prosecution pending, penalty, punishment, disqualification from office or employment, forfeiture incurred, or rights, powers or remedies accrued under any law in effect immediately prior to the effective date of this amendatory Act of 1983, which related to the abolished offense. The provisions of this amendatory Act insofar as they are the same or substantially the same as those of any prior statute, shall be construed as a continuation of such prior statute and not as a new enactment.

"This amendatory Act of 1983 shall only apply to those persons who commit offenses prohibited under Sections 12-13 through 12-16 of the Criminal Code of 1961, as amended, on or after the effective date of this amendatory Act."

## 5/12-13.  Criminal sexual assault

§ 12-13.  Criminal Sexual Assault.  (a) The accused commits criminal sexual assault if he or she:

(1) commits an act of sexual penetration by the use of force or threat of force; or

(2) commits an act of sexual penetration and the accused knew that the victim was unable to understand the nature of the act or was unable to give knowing consent; or

(3) commits an act of sexual penetration with a victim who was under 18 years of age when the act was committed and the accused was a family member; or

(4) commits an act of sexual penetration with a victim who was at least 13 years of age but under 18 years of age when the act was committed and the accused was 17 years of age or over and held a position of trust, authority or supervision in relation to the victim.

(b) Sentence.  Criminal sexual assault is a Class 1 felony.  A second or subsequent conviction for a violation of this Section or under any similar statute of this State or any other state for any offense involving criminal sexual assault that is substantially equivalent to or more serious than the sexual assault prohibited under this Section is a Class X felony.  When a person has any such prior conviction, the information or indictment charging that person shall state such prior conviction so as to give notice of the

State's intention to treat the charge as a Class X felony. The fact of such prior conviction is not an element of the offense and may not be disclosed to the jury during trial unless otherwise permitted by issues properly raised during such trial.

Laws 1961, p. 1983, § 12-13, added by P.A. 83-1067, § 1, eff. July 1, 1984. Amended by P.A. 83-1117, § 1, eff. July 1, 1984;  P.A. 85-837, § 2, eff. Jan. 1, 1988;  P.A. 85-1030, § 2, eff. July 1, 1988;  P.A. 85-1209, Art. II, § 2-23, eff. Aug. 30, 1988;  P.A. 85-1440, Art. II, § 2-9, eff. Feb. 1, 1989.

Formerly Ill.Rev.Stat.1991, ch. 38, ¶ 12-13.

  P.A. 85-1003, § 1, which amended this section, eff. July 1, 1988, was repealed by P.A. 85-1030, § 1, eff. June 30, 1988.

  Article III of P.A. 85-1209, the First 85th General Assembly Combining Revisory Act, resolved multiple actions in the 85th General Assembly and made certain technical corrections through P.A. 85-1016.

  Article II of P.A. 85-1440, the Second 85th General Assembly Combining Revisory Act, resolved multiple actions and made technical corrections in P.A. 85-1015 through P.A. 85-1427.

## 5/12-14.  Aggravated criminal sexual assault

§ 12-14.  Aggravated Criminal Sexual Assault.  (a) The accused commits aggravated criminal sexual assault if he or she commits criminal sexual assault and any of the following aggravating circumstances existed during the commission of the offense:

(1) the accused displayed, threatened to use, or used a dangerous weapon or any object fashioned or utilized in such a manner as to lead the victim under the circumstances reasonably to believe it to be a dangerous weapon; or

(2) the accused caused bodily harm to the victim; or

(3) the accused acted in such a manner as to threaten or endanger the life of the victim or any other person; or

(4) the criminal sexual assault was perpetrated during the course of the commission or attempted commission of any other felony by the accused; or

(5) the victim was 60 years of age or over when the offense was committed; or

(6) the victim was a physically handicapped person.

(b) The accused commits aggravated criminal sexual assault if:

(1) the accused was 17 years of age or over and commits an act of sexual penetration with a victim who was under 13 years of age when the act was committed; or

(2) the accused was under 17 years of age and commits an act of sexual penetration with a victim who was under 9 years of age when the act was committed; or (ii) commits an act of sexual penetration with a victim who was at least 9 years of age but under 13 years of age when the act was committed and the accused used force or threat of force to commit the act.

(c) The accused commits aggravated criminal sexual assault if he or she commits an act of sexual penetration with a victim who was an institutionalized severely or profoundly mentally retarded person at the time the act was committed.

(d) Sentence.  Aggravated criminal sexual assault is a Class X felony.

Laws 1961, p. 1983, § 12-14, added by P.A. 83-1067, § 1, eff. July 1, 1984. Amended by P.A. 83-1117, § 1, eff. July 1, 1984;  P.A. 85-691, § 1, eff. Jan. 1, 1988;  P.A. 85-1392, § 1, eff. Jan. 1, 1989.

Formerly Ill.Rev.Stat.1991, ch. 38, ¶ 12-14.

## 5/12-16.  [Aggravated criminal sexual abuse]

§ 12-16.  [Aggravated criminal sexual abuse.] The accused commits aggravated criminal sexual abuse if he or she commits an act of sexual conduct in violation of Section [...] and any of the following aggravating circumstances existed during the commission of the offense:

(1) the accused displayed, threatened to use, or used a dangerous weapon or any object fashioned or utilized in such a manner [...] stances reasonably [...]

(2) the accused [...]

(3) the victim [...]

(4) the victim [...]

(b) The accused [...] abuse if he or she [...] commits an act [...]

(c) The accused [...] abuse if:

(1) the accused [...] commits an act [...] under 18 years [...] commits an act [...] at 13 years [...]

## IN THE CIRCUIT OF THE SIXTEENTH JUDICIAL CIRCUIT
## KANE COUNTY, ILLINOIS

PEOPLE OF THE STATE OF ILLINOIS )

              vs. )       No.  93-CF-1410

)

CHAD WAHL )
        **Defendant - Petitioner** )

)

### AFFIDAVIT

NOW COMES Chad Wahl, being first duly sworn on oath, states the following:

1.    On September 24, 1999 I filed a second *pro se* Post Conviction Petition.

2.    The Circuit Clerk of Kane County failed to docket my September 24, 1999 second *pro se* Post Conviction Petition.

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure [735 ILCS 5/1-109], the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true.

_____        _10 - 6_____, 2003
Chad Wahl                                     Date


STATE OF ILLINOIS         )
COUNTY OF  _Jefferson____  )  ss.

Subscribed and sworn to me before this  _6th___ day of _October____, 2003

_____
Notary Public

**"OFFICIAL SEAL"**
**JENNIFER L. WILSON**
Notary Public, State of Illinois
My Commission Exp. 07/31/2004

# IN THE CIRCUIT COURT OF THE SIXTEENTH JUDICIAL CIRCUIT
## KANE COUNTY, ILLINOIS

Case No. 93 CF 1410

| | | |
|---|---|---|
| People of the State of Illinois | CHAD WAHL | |
| Plaintiff(s) | Defendant(s) | Clerk of the Circuit Court Kane County, IL |
| Plaintiff(s) Atty. Walsh | Vincent | NOV 0 8 2004 |
| | Defendant(s) | |
| Judge Doyle | Court Reporter Mann | Deputy Clerk Leslie | FILED ENTERED 018 |

A copy of this order ☐ should be sent ☐ has been sent
Present
☐ Plaintiff Atty. ☐ Defense Atty. ☐ Other _____

File Stamp

## ORDER

This MATTER coming before the Court for Defendant-Petitioner's Second Amended petition for Post-Conviction relief under 725 ILCS 5/122-1 et. seq. AND the defendant-petitioner voluntarily having waived his presence through Affidavit AND the Court, having heard AND considered legal Argument AND applicable case law, Denies the Defendant-petitioner's motion.

Date: Nov. 8 2004   ☐ Yes - Disposal   ☐ No - Disposal

Judge



C001168

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing documents was served by undersigned on the parties listed below, or their attorneys on this the ~~20th~~ day of _October_, 2004.

$\times$ Placing same, with postage fully prepaid and in an envelope legibly addressed, in a United States Post Office box in Carbondale, Illinois.

____ Personally delivering same to parties.

Kane County State's Attorney
300 Judicial Center
37W777 Rt. 38
St. Charles, IL 60175



Deborah Seyller
Clerk of the Circuit Court
Kane County, IL

OCT 2 5 2004

FILED    020

C001167

This Order Is Not Precedential
And Is Not To Be Cited

No. 2--05--1215

**FILED**

OCT 2 4 2006

ROBERT J. MANGAN, CLERK
APPELLATE COURT 2nd DISTRICT

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) ) | |
| v. | ) ) | No. 93--CF--1410 |
| CHAD WAHL, | ) ) | Honorable James T. Doyle, |
| Defendant-Appellant. | ) ) | Judge, Presiding. |

**RULE 23 ORDER**

Defendant, Chad Wahl, appeals the trial court's denial of his second postconviction petition. In his petition, defendant asserted that the indictment leading to his conviction of aggravated criminal sexual assault (720 ILCS 5/12--14(b)(1) (West 1992) (formerly Ill. Rev. Stat. 1991, ch. 38, par. 12--14(b)(1)) was void because it alleged an act of "sexual conduct" instead of an act of "sexual penetration." For the reasons that follow, we affirm.

In November 1993, following a jury trial, defendant was found guilty of six counts of aggravated criminal sexual abuse (720 ILCS 5/12--16(c)(1)(i) (West 1992)), one count of aggravated criminal sexual assault (720 ILCS 5/8--14(b)(1) (West 1992)), and one count of attempted aggravated criminal sexual assault (720 ILCS 5/8--4(a), 12--14(b)(1) (West 1992)), and sentenced to a total of 41 years' imprisonment. On direct appeal, defendant did not challenge the validity of the count of the indictment charging him with aggravated criminal sexual assault. This court affirmed

EXHIBIT G

No. 2--05--1215

defendant's conviction and sentence, but we vacated a $100 sexual assault fine that the trial court imposed. People v. Wahl, 285 Ill. App. 3d 288 (1996).

Approximately one month after we issued our mandate from the direct appeal, defendant petitioned for postconviction relief in the trial court. Once again, defendant did not challenge the validity of the count of the indictment charging him with aggravated criminal sexual assault. The trial court dismissed the petition, and this court affirmed the dismissal. People v. Wahl, No. 2--99--1370 (2001) (unpublished order under Supreme Court Rule 23).

In September 1999, while defendant's appeal from the dismissal of his postconviction petition was pending in this court, defendant attempted to file a second petition for postconviction relief in the trial court. This petition was never docketed, and an amended petition was filed through counsel in October 2003. As amended, defendant's second postconviction petition alleged that the trial court lacked jurisdiction to impose a conviction upon the count of the indictment alleging aggravated criminal sexual assault because that count failed to charge defendant with a crime. Specifically, the count alleged that:

> "On or about June of 1991 through March 5, 1992[,] Chad E. Wahl committed the offense of aggravated criminal sexual assault *** in violation of Chapter 38, Section 12--14(b)(1) of the Illinois Revised Statutes, as amended, in that said defendant, who was 17 years of age or older, intentionally committed an act of sexual penetration with [J.C.], who was under 13 years of age when the act was committed, in that said defendant placed his finger on the anus of [J.C.] All of the foregoing occurred in Kane County, Illinois."

Defendant argued that placing a finger on another's anus was not an act of "sexual penetration" for purposes of the offense of aggravated criminal sexual assault. The State did not move to dismiss the

No. 2--05--1215

We now consider the merits of this appeal. Except in cases where the defendant has been sentenced to death, proceedings under the Post-Conviction Hearing Act (725 ILCS 5/122--1 et seq. (West 2002)) are divided into three distinct stages. People v. Gaultney, 174 Ill. 2d 410, 418 (1996). This appeal concerns a denial of a petition at the third such stage, i.e., following an "evidentiary hearing." Gaultney, 174 Ill. 2d at 418. At the third stage, the trial court generally determines whether the evidence presented at hearing establishes that the defendant is entitled to relief. People v. Dodds, 344 Ill. App. 3d 513, 520 (2003). Thus, we most often examine a denial of a petition at the third stage under a manifestly erroneous standard of review. People v. Childress, 191 Ill. 2d 168, 174 (2000). However, reviewing courts have evaluated such denials de novo (People v. Johnson, 206 Ill. 2d 348, 360 (2002) (and cases cited therein)), especially when, as here, the denial was based on the parties' legal arguments, no evidence was submitted to the trial court, and the issue raised is one of law (see People v. Caballero, 206 Ill. 2d 65, 87-88 (2002)). Thus, we will review de novo the trial court's third-stage denial of defendant's second postconviction petition. Johnson, 206 Ill. 2d at 360; see also People v. Brogan, 352 Ill. App. 3d 477, 485 (2004) (court reviewed de novo challenge to indictment made for first time on appeal).

In the instant case, the trial court denied defendant's second postconviction petition after determining that the issue raised in the petition had been previously adjudicated. The record belies this conclusion and we conclude the trial court erred in denying the petition on the basis of res judicata. We will therefore turn to a consideration of defendant's contention that the count charging him with the offense of aggravated criminal sexual assault was void.

In order to vest a court with jurisdiction in a criminal case, the indictment must charge the defendant with a crime. People v. Ikpoh, 242 Ill. App. 3d 365, 380 (1993). That is, the indictment

-4-

must contain (1) the name of the accused, (2) the name, date, and place of the offense, (3) a citation to the statute allegedly violated, and (4) the nature and elements of the offense, as set forth in the language of the statute.  People v. Collins, 214 Ill. 2d 206, 219 (2005).  Here, the indictment satisfied these requirements.  The indictment named defendant as the accused and alleged that defendant had committed the offense of aggravated criminal sexual assault.  The indictment alleged June 1991 through March 5, 1992, as the date of the offense, and Kane County, Illinois, as the location of the crime.  The indictment cited the relevant statute and also alleged that defendant, who was 17 years of age or older, engaged in "sexual penetration" with J.C., a person under 13 years old.  As alleged, the indictment was sufficient to vest the trial court with jurisdiction.  See People v. Pujoue, 61 Ill. 2d 335, 340 (1975).

Additionally, where a defendant challenges an indictment after having proceeded to trial, the indictment is considered sufficient if it " 'apprised the accused of the precise offense charged with sufficient specificity to prepare his defense and allow pleading a resulting conviction as a bar to future prosecution arising out of the same conduct.' "  People v. Thingvold, 145 Ill. 2d 441, 448 (1991), quoting People v. Gilmore, 63 Ill. 2d 23, 29 (1976).  The record in the instant case reveals that defendant was aware of the need to defend against an act of "sexual penetration."  During the pretrial proceedings, J.C. testified that defendant committed acts of "sexual penetration" against him when defendant placed his finger "up" J.C.'s "butt" four or five times.  J.C.'s pretrial statements were consistent with the J.C.D.'s testimony at trial that defendant had placed his finger in J.C.'s anus.  The conduct of which defendant was convicted is sufficiently spread of the record such that the pleading of his conviction would bar a future prosecution arising out of the same conduct.  See People v.

No. 2--05--1215

Puioue, 61 Ill. 2d 335, 340 (1975); People v. Jones, 53 Ill. 2d 460, 464 (1973) (noting that a prior conviction on the same facts may be proved by resort to the record).

In reaching our conclusion that the indictment was sufficient, we note that the indictment's reference to defendant putting his finger on J.C.'s anus was surplusage. The indictment's allegations that defendant had committed an act of "sexual penetration " were sufficiently specific to inform defendant with reasonable certainty of the offense he was accused of committing. See People v. Boand, 362 Ill. App. 3d 106, 130 (2005). The additional allegation of the specific physical acts constituting the sexual penetration was mere surplusage that did not invalidate the indictment. Boand, 362 Ill. App. 3d at 130; see also Ikpoh, 242 Ill. App. 3d at 380-81 (holding that indictment's allegation that the defendant "touched the vaginal area" of victim was surplusage); People v. Lewis, 147 Ill. App. 3d 249, 252 (1986) (holding that indictment's allegation of various acts of sexual penetration was surplusage). Thus, defendant's challenge to the indictment must fail and we affirm the trial court's denial of defendant's second postconviction petition.

For these reasons, the judgment of the circuit court of Kane County is affirmed.

Affirmed.

HUTCHINSON, J., with BOWMAN and GILLERAN JOHNSON, JJ., concurring.

103760

**SUPREME COURT OF ILLINOIS**
**CLERK OF THE COURT**
SUPREME COURT BUILDING
SPRINGFIELD, ILLINOIS 62701
(217) 782-2035

January 24, 2007


Hon. Lisa Madigan
Attorney General, Criminal Appeals Div.
100 W. Randolph St., 12th Flr.
Chicago, IL 60601

No. 103760 - People State of Illinois, respondent, v. Chad
Wahl, petitioner. Leave to appeal, Appellate
Court, Second District.


The Supreme Court today DENIED the petition for leave to

appeal in the above entitled cause.


The mandate of this Court will issue to the Appellate Court

on March 1, 2007.

EXHIBIT H